[Cite as *State v. Glenn*, 2012-Ohio-3075.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

---

## JOURNAL ENTRY AND OPINION
## No. 97314

---

# STATE OF OHIO

## PLAINTIFF-APPELLEE

vs.

# JERREL T. GLENN

## DEFENDANT-APPELLANT

---

## JUDGMENT:
### AFFIRMED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-535072

**BEFORE:** Cooney, J., Boyle, P.J., and Kilbane, J.

**RELEASED AND JOURNALIZED:** July 5, 2012

**ATTORNEY FOR APPELLANT**

Joseph E. Feighan, III
14516 Detroit Avenue
Lakewood, Ohio 44107


**ATTORNEYS FOR APPELLEE**

William D. Mason
Cuyahoga County Prosecutor

By:   Stephanie Heibertshausen
Assistant County Prosecutor
9th Floor, Justice Center
1200 Ontario Street
Cleveland, Ohio 44113

COLLEEN CONWAY COONEY, J.:

{¶1} Defendant-appellant, Jerrel Glenn ("Glenn"), appeals his convictions and sentence. We find no merit to the appeal and affirm.

{¶2} In March 2010, Glenn was charged with six counts of kidnapping, two counts of attempted murder, four counts of felonious assault, and five counts of aggravated robbery. All the charges included one- and three-year firearm specifications. The indictment alleged a conspiracy to rob and shoot Kenneth Elsleger ("Kenneth"), who was known to carry large amounts of cash.

{¶3} At a bench trial, Kenneth testified that on the night of the shooting, he had gone out drinking with Glenn, his brother Joseph Elsleger ("Joseph"), and two friends, Mario Galipo ("Galipo") and Samantha DiVincenzo ("DiVincenzo"). After stopping at the Lido Lounge, the group went to Scorekeeper's Lounge ("the bar") in Parma and returned to Kenneth's apartment building at 2:30 a.m. When Kenneth parked the car, Glenn exited the vehicle and quickly disappeared. Galipo and DiVincenzo, who had been arguing, walked over to Galipo's car so DiVincenzo could retrieve items from the trunk. Joseph accompanied the couple to the car to help DiVincenzo carry these items.

{¶4}   Meanwhile, a man wearing a hooded sweatshirt confronted Kenneth in the parking lot and ordered him to empty his pockets.   Kenneth raised his hands.   The man shot a gun into the air and ripped a necklace from Kenneth's neck.   Joseph heard the commotion and returned to assist Kenneth.   Joseph did not see the gunman's face but recognized the gun as a Glock firearm.   To prevent the gunman from shooting Kenneth, Joseph grabbed the man's arm.   Galipo observed the struggle and pulled Joseph off the gunman.   The gunman shot Joseph in the stomach and fled.   During the struggle, the gunman also shot Kenneth in the neck.   Kenneth sustained a spinal cord injury, which resulted in quadriplegia.

{¶5}   DiVincenzo called the police.   Officer Daniel Kravanis ("Kravanis") of the Parma Heights police, responded to the scene.   Kravanis testified that there was a "fresh blanket" of snow on the ground and that he observed a single set of footprints leaving the scene.   He followed the footprints past two apartment complexes, through a parking lot, and up to the entrance of another apartment building.

{¶6}   Although Kenneth was the only witness who saw the gunman's face, all the witnesses agreed the suspect was a stocky, white, balding male, approximately 5'6" tall, and wearing a hooded sweatshirt.   When Kravanis reached the end of footprints, he observed a person who matched the description.   This person, who was later identified as Adam Cassano ("Cassano"), told Kravanis that he had just arrived at the apartment. Moments later, a second man, who was later identified as Glenn, exited the building and greeted Cassano.   In response to questioning, Glenn told Kravanis he had been with his

friends on the third floor all night. However, when Kravanis questioned the men in the apartment, they informed him that Glenn had just arrived, and that Cassano had been with them in the apartment all night.

{¶7} Detective Daniel Heinz ("Heinz") of the Parma police testified that during his investigation of the crime scene, he found a "fired bullet" and two spent shell casings near a blood stain in the parking lot. Jonathan Gardner ("Gardner"), a firearms expert from the Bureau of Criminal Investigation, testified that the fired bullet and the shell casings recovered from the scene came from a 9mm Glock firearm.

{¶8} Glenn told police he intended to walk home from Kenneth's apartment upon their return from the bar. Parma police detective Michael Klein ("Klein") determined that Glenn's residence was located midway between the bar and Kenneth's apartment, and that the distance between Kenneth's and Glenn's apartments was approximately two miles. He doubted Glenn's claim that he intended to walk home on a cold snowy night at 2:30 a.m. after a night of drinking when Kenneth could have easily dropped him off as they passed his residence on the way home. Further, at a police interview, Glenn denied leaving his car at Kenneth's address. However, further investigation revealed that Glenn's car was in fact parked at the crime scene.

{¶9} As a result of numerous inconsistencies in his story, police suspected Glenn was involved in the shooting and obtained a record of his cell phone activity. These records showed that he sent and received several text messages to the same phone number

shortly before the shooting. The messages seemed to direct the recipient to the victims' location.

{¶10} The State called John Brogan of Verizon Wireless to verify the authenticity of Glenn's cell phone records and the records of the unidentified recipient of Glenn's messages. The recipient used a Boost Mobile cell phone ("Boost Mobile phone"), which is a pay-as-you-go phone that keeps no subscriber information. The Verizon records established that Glenn periodically informed the user of the Boost Mobile phone of his whereabouts and activities during the night. One message from the Boost Mobile phone to Glenn's phone stated: "Keep me updated." A message from Glenn's phone to the Boost Mobile phone stated: "I'll call you again once I get a chance." At 1:24 a.m., a message from the Boost Mobile phone to Glenn's phone asked: "Which complex?" Moments later, a message from Glenn's phone replied: "It's in Forrest Ridge. You would see my car." At 1:31 a.m., a message from the Boost Mobile phone stated: "I'm walking around here. All the cars got snow on them by the pools or farther download." A message from Glenn's phone responded, "My car right there." Still unable to find Glenn's car, the recipient of Glenn's messages complained: "There are a lot of buildings is BT the side street?" Finally, at 2:31 a.m., a message from Glenn's phone informed: "We on our way."

{¶11} Police further discovered that the Boost Mobile phone made calls to a landline telephone at Cassano's mother's house, where Cassano lived. The day after Cassano was interviewed by police, Glenn called the Boost Mobile phone, received no

answer, and immediately called the landline at the Cassano home. Using this information, the police obtained a search warrant, searched the Cassano home, and found a large quantity of firearms. Detective Klein testified that he also recovered a clip belonging to a nine millimeter Glock handgun and a photo of Cassano and Glenn with an identified female. The firearm used in the crimes, however, was never recovered.

{¶12} At the conclusion of the trial, the court found Glenn guilty of four counts of felonious assault and two counts of aggravated robbery. All the charges included one- and three-year firearm specifications. The court merged Counts 4 and 5, which alleged felonious assault on Kenneth, and Counts 11 and 12, which alleged felonious assault on Joseph. The court sentenced Glenn to an aggregate 16-year prison term with mandatory five years' postrelease control. Glenn now appeals, raising four assignments of error.

<u>Sufficiency and Manifest Weight</u>

{¶13} In his first and second assignments of error, Glenn argues there is insufficient evidence to support his convictions and that his convictions are not supported by the manifest weight of the evidence. Glenn contends there was insufficient evidence to support the convictions because none of the witnesses could identify Cassano as the gunman and there is no evidence linking him to the gunman. He also contends the evidence of text messaging lacked substance and probative value. We address these assigned errors together because they are closely related.

{¶14} The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Thompkins*, 78 Ohio St.3d 380, 390,

1997-Ohio-52, 678 N.E.2d 541. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 942 (1991), paragraph two of the syllabus. Further, "proof may be made by circumstantial evidence as well as by real evidence and direct or testimonial evidence, or any combination." *Id.* at 272.

{¶15} A challenge to the manifest weight of the evidence attacks the verdict in light of the State's burden of proof beyond a reasonable doubt. *Thompkins* at 386-87. A reviewing court may reverse the judgment of conviction if it appears that the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.* A finding that a conviction was supported by the manifest weight of the evidence necessarily includes a finding of sufficiency. *Id.* at 388.

{¶16} Glenn claims the text messages constituted social communication between friends rather than aiding and abetting a crime. However, as previously stated, messages sent from Glenn's phone to the Boost Mobile phone directed the recipient to the victims' location at the same time the shooting occurred. The recipient of Glenn's messages not only asked for periodic updates on Glenn's present location, but also sought clarification of the location of Glenn's car. The last message sent from Glenn's phone before the robbery simply stated: "We on the way." None of these messages, however, were offered for the truth of their contents. Thus, they did not constitute hearsay.

**{¶17}** DiVincenzo testified that she observed Glenn send and receive numerous text messages the night of the shooting. While they were driving back to Kenneth's apartment from the bar, she observed Glenn "being sneaky on the phone, like trying to hide it in-between his legs." The text messages coupled with the presence of an armed robber waiting for victims to arrive at 2:30 a.m. on a cold snowy night allowed the trier of fact to reasonably conclude that Glenn directed the robber to this location at the precise time the group returned. It is doubtful that a random robber would lie in wait in the cold at 2:30 a.m. unless he knew the victim would be arriving shortly.

**{¶18}** Finally, Glenn argues that because the evidence linking Cassano to the crime is insufficient, the evidence of Glenn's participation in the crime is likewise insufficient. We disagree.

**{¶19}** Glenn asserts that because none of the witnesses at the shooting could identify Cassano from the photo arrays, the evidence failed to prove that Cassano was the gunman. However, the State used circumstantial evidence to prove Cassano's role in the crimes. Although the witnesses were unable to identify Cassano as the shooter, they all provided the same general description of his height and weight, baldness, and hooded sweatshirt.

**{¶20}** Moreover, circumstantial evidence proved Cassano used the Boost Mobile phone on the night the crimes were committed. First, Officer Kravanis met him near the crime scene shortly after the shooting. Cassano falsely informed Kravanis that he had just arrived at the apartment, apparently attempting to distance himself from the crime.

The cell phone records showed that someone using the Boost Mobile phone called the Cassano house. The records also showed that when Glenn called the Boost Mobile phone and received no answer, he immediately called the landline at Cassano's home, obviously trying to reach the person who usually answers the Boost Mobile phone. Each of these facts, considered alone, is innocuous. However, when all the facts are considered together, they tell the story of how Glenn and Cassano conspired to rob Kenneth, whom they knew carried a large amount of cash. It is not clear whether Joseph was a premeditated target, but the evidence is clear he was a victim of their conspiracy.

{¶21} Therefore, there is sufficient evidence to support the convictions, and the convictions are not against the manifest weight of the evidence.

{¶22} The first and second assignments of error are overruled.

### Text Message Evidence

{¶23} In his third assignment of error, Glenn argues the court erroneously admitted evidence of text messages into evidence. He contends the evidence was not properly authenticated under Evid.R. 901(A), and that the evidence constituted inadmissible hearsay.

{¶24} First, as we noted above, the messages were not offered for the truth of their contents and thus are not hearsay. Even if considered hearsay, however, they fit within an exception to the hearsay rule.

{¶25} Evid.R. 901 governs the authentication of demonstrative evidence such as recordings of telephone conversations and text messages. The threshold for admission is

quite low, as the proponent need only submit "evidence sufficient to support a finding that the matter in question is what its proponent claims." Evid.R. 901(A). This means that "the proponent must present foundational evidence that is sufficient to constitute a rational basis for a jury to decide that the primary evidence is what its proponent claims it to be." *State v. Payton*, 4th Dist. No. 01CA2606, 2002 WL 184922 (Jan. 25, 2002). A proponent may demonstrate genuineness or authenticity through direct or circumstantial evidence. *State v. Williams*, 64 Ohio App.2d 271, 274, 413 N.E.2d 1212 (8th Dist.1979).

{¶26} Hearsay is generally not admissible unless it falls within one of the recognized exceptions. Evid.R. 802; *State v. Steffen*, 31 Ohio St.3d 111, 119, 509 N.E.2d 383 (1987). Evid.R. 803(6) provides a hearsay exception for regularly recorded business records. A telephone or cell phone record may fall within the business record exception provided under 803(6), if properly authenticated. *State v. Hirtzinger*, 124 Ohio App.3d 40, 49, 705 N.E.2d 395 (2d Dist.1997); *State v. Knox*, 18 Ohio App.3d 36, 37, 480 N.E.2d 120 (9th Dist.1984). Evid.R. 803(6) provides:

> A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or as provided by Rule 901(B)(10), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term 'business' as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

**{¶27}** Thus, the rule requires that a custodian, or other qualified witness, testify as to the regularity and reliability of the business activity involved in the creation of the record. While the witness providing this foundational testimony need not have firsthand knowledge of the transaction, he or she must be sufficiently familiar with the operation of the business and with the circumstances of the record's preparation, maintenance, and retrieval. *Hirtzinger* at 49.

**{¶28}** The State called a Verizon representative, John Brogan, to lay the foundation and to authenticate Glenn's cell phone records. Brogan, testifying as a custodian of records, stated that Verizon regularly maintains a detailed list of the identities of their customers and their customers' cell phone usage. He explained that computers automatically record incoming and outgoing calls, call duration, and content. There was no evidence to suggest that the automatic recording of cell phone activity was unreliable. Moreover, he testified that Verizon maintains these records in the regular course of business for billing and rate plan purposes, and Verizon often makes this information available to police as a courtesy to law enforcement. Based on his testimony, we find that Brogan properly authenticated the cell phone records as business records, which are excepted from the hearsay rule.

**{¶29}** Therefore, the third assignment of error is overruled.

## Consecutive Sentences

**{¶30}** In his fourth assignment of error, Glenn argues the trial court erred by sentencing him to three consecutive three-year terms on the firearm specifications. He

contends the court was required by law to merge multiple firearm specifications for sentencing if the specifications involve the same "act or transaction." In support of this argument, Glenn relies on R.C. 2929.14(D)(1).

{¶31} R.C. 2929.14(D)(1)(b), as it existed at the time of sentencing, prohibited a trial court from imposing more than one prison term for multiple firearm specifications if the specifications were committed as part of the same act or transaction. However, R.C. 2929.14(D)(1)(g) provided an exception for certain felonies including felonious assault and aggravated robbery. R.C. 2929.14(D)(1)(g)[1] stated:

> If an offender is convicted of or pleads guilty to two or more felonies, if one or more of those felonies is aggravated murder, murder, attempted aggravated murder, attempted murder, aggravated robbery, felonious assault, or rape, and if the offender is convicted of or pleads guilty to a specification of the type described under division (D)(1)(a) of this section in connection with two or more of the felonies, the sentencing court shall impose on the offender the prison term specified under division (D)(1)(a) of this section for each of the two most serious specifications of which the offender is convicted or to which the offender pleads guilty and, in its discretion, also may impose on the offender the prison term specified under that division for any or all of the remaining specifications.

{¶32} The sentencing entry states that Glenn was found guilty of four counts of felonious assault (Counts 4, 5, 11, and 12) and two counts of aggravated robbery (Counts 6 and 7). All of these charges included one- and three-year firearm specifications. Under R.C. 2929.14(D)(1)(g), the court was required to impose prison terms for the two most serious firearm specifications against that victim and had discretion to impose a

---

[1] R.C. 2929.14, as amended by H.B. 86, provides the same language in what is now R.C. 2929.14(B)(1)(g).

sentence for the third firearm specification. *State v. Worth*, 10th Dist. No. 10AP-1125, 2012-Ohio-666, ¶ 96. Glenn does not contend that the court abused its discretion by imposing a sentence for the third firearm specification. Because the sentence was not contrary to law, and Glenn offers no reason to question the court's discretion, we find no error.

{¶33} The fourth assignment of error is overruled.

Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The conviction having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
COLLEEN CONWAY COONEY, JUDGE

MARY J. BOYLE, P.J., and
MARY EILEEN KILBANE, J., CONCUR