[Cite as *State v. Brown*, 2019-Ohio-1235.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 106582**

**STATE OF OHIO**

PLAINTIFF-APPELLEE

vs.

**DORIAN BROWN**

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-15-600700-A

**BEFORE:** Keough, J., E.A. Gallagher, P.J., and Jones, J.

**RELEASED AND JOURNALIZED:** April 4, 2019

**ATTORNEY FOR APPELLANT**

Eric M. Levy
55 Public Square, Suite 1600
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor
By: Andrew J. Santoli
      Holly Welsh
Assistant County Prosecutors
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113


KATHLEEN ANN KEOUGH, J.:

{¶1} In this delayed appeal, defendant-appellant, Dorian Brown ("Brown"), appeals his convictions for trafficking in persons and compelling prostitution. For the reasons that follow, we affirm.

{¶2} In November 2015, Brown was named in a 12-count indictment charging him with aggravated murder, murder, two counts of aggravated robbery, three counts of felonious assault, kidnapping, trafficking in persons, compelling prostitution, and grand theft. Most counts contained firearm, prior conviction, and repeat violent offender specifications.

{¶3} The case proceeded to a jury trial, where the following relevant evidence pertaining to Brown's convictions was presented.

{¶4} D.R., the victim identified in the trafficking in persons charge, testified that following her nineteenth birthday, she was struggling financially to support herself and her minor

child. She approached her friend, D.B. who had told her that she engaged in prostitution and that her "dudes" would help D.R. and "get her where she needed to be." D.R. stated that because she trusted D.B. that she would be "100 percent safe," she voluntarily entered the world of prostitution. Around June 18, 2015, D.B.'s pimp, Jason Dowell a.k.a. Santana, picked up D.R. and her minor child and brought them to an Econo Lodge in Warrensville, Heights, Ohio. According to D.R., Santana explained the process from taking pictures to creating advertisements. When she arrived at the hotel, she met other prostitutes, including B.F.; Brown was also present. D.R. stated that B.F. and D.B. helped her with photographs and creating her backpage.com escort advertisement.

{¶5} At first D.R. worked for Santana, who paid for the hotel rooms, provided her and her son with food, and took care of them. However, he did not give her any money to help her financially support herself. She stopped working for him after a few days and began working for Brown, who told her he would give her fifty-percent of the money received from her "dates." D.R., D.B., and B.F. started working for Brown at an America's Best Value Inn near the airport.

{¶6} Throughout D.R.'s relationship with Brown, he took her and the other "girls"[1] to work at different hotels in Northeast Ohio and to Columbus on one occasion. D.R. stated that Brown once took her, D.B., B.F., another girl, and his girlfriend to Maryland because Brown "wanted to do something nice for us." Although D.R. stated it was a vacation, "we did work."

{¶7} Over time, Brown stopped giving D.R. money. According to D.R., Brown wanted to "build" the business and get a house instead of having to rent hotel rooms. From this point

---

[1]When testifying, D.R. referred to the other prostitutes who worked for Brown as "girls." Accordingly, we will use that terminology in this opinion.

forward, Brown kept all the money D.R. earned. She stated that she did not want Brown to take all the money, but felt that he would be taking care of her and her son, so "it would be fine."

{¶8} However, the money situation was not "fine." By the end of June, or early July 2015, Brown stopped giving any money to D.R. even when she asked. She said typically he would give her money to get her nails done or buy clothes, but that stopped. It was clear to her and the other girls that Brown was treating them differently, which upset them. D.R. explained that she started prostituting to help herself and her son, but she was not getting any help; she needed money. D.R. said that she "wanted to get in, make the money, and get out." And when Brown changed the money arrangement, "it just kind of had me stuck there and I didn't really know what to do after that; I felt like I was in too deep."

{¶9} Despite the financial control over the girls, D.R. testified that she never saw Brown physically assaulting anyone, but once heard, in an adjacent room, an altercation between B.F. and Brown. She stated she heard "banging, [B.F.] yelling, and * * * things being thrown," and "cussing." Hearing this made D.R. "nervous because she did not want Brown to feel like he had to put his hands on [her]; so [she] cooperated and did what he asked [her] to do."

{¶10} Eventually, B.F. and D.B. decided to leave Brown. D.R. stated that she felt she could not leave because she needed money and had nowhere to go. It was after D.B. left that Brown got upset with her and grabbed her arm when the cost of a tattoo exceeded the original-quoted price — she said this made her feel "powerless" because without Brown she would "have nothing for her son."

{¶11} However, one night after Brown and his girlfriend left the hotel, D.R. left at D.B.'s encouragement and stayed in another room in the hotel. She and D.B. began working with

Cartier and Dave. Brown's girlfriend called D.R. asking about her whereabouts, and despite being in the same hotel, D.R. told her that her aunt had picked her up.

{¶12} In the early morning hours of June 17, 2015, about four or five days after her abrupt decision to leave Brown, D.R. received a call about a "special" that she and D.B. offered where a person could receive services from two girls for one price. The escort advertisement included pictures of both D.R. and D.B. When she received the call, D.B. was no longer working in the business, but another prostitute, Elizabeth O'Brien, was working with D.R.

{¶13} When the caller arrived at the room, he was not alone. The men were later identified as Octavius Hudson and Marcellus Webster. Hudson testified that he and his friend Webster, who is also Brown's cousin, responded to the "backpage.com" escort advertisement. According to Hudson, Brown directed them to the Econo Lodge in Warrensville Heights.

{¶14} Hudson testified that when he and Webster arrived at the hotel room, they formulated a plan to only rob the two girls; however, he engaged in sexual conduct with D.R. prior to the attempted robbery. Following the sexual encounter, Hudson brandished his firearm and demanded money. Elizabeth attempted to attack Hudson; however, the gun fired, killing Elizabeth.

{¶15} Phone records revealed that during the early morning hours of July 17, 2015, Brown called Hudson's phone six times between 3:34 a.m. and 4:34 a.m. Hudson testified that following the shooting, Brown told him to discard his cell phone. Citing to "the code," he testified that Brown was not involved in the robbery, and denied telling police that Webster and Brown set up the robbery. The state's theory of the case was that Brown orchestrated the robbery in retaliation for D.R. and D.B. leaving.

{¶16} D.R. testified that after she left Brown, she never heard from him again until after Elizabeth's murder, when he called her. She stated she was scared to talk to him.

{¶17} D.B. testified that she worked as a prostitute for Santana, but when he left her, she started working for Brown. She stated that Brown was never physically abusive toward her, and she had no knowledge of him being abusive toward D.R, but knew that he abused B.F. Additionally, D.B. stated that she never witnessed, saw, or heard about any repercussions that any girl faced who left Brown. Nevertheless, she stated she was scared to testify, because she did not want to get hurt. D.B. admitted that had she not left "the business," she would have been in the room with D.R. the night Elizabeth was shot.

{¶18} B.F. testified that she began working as a prostitute for Brown in June 2015. She stated that he took pictures of her, and created her backpage.com advertisements. According to B.F., she was supposed to receive one-half of her earnings, but Brown did not give her any money. According to B.F., Brown wanted her to get a tattoo of a crown with a "D" on it, but she refused. She testified, over objection, that she left Brown because "he started to become something he wasn't and he kept putting his hands on me." (Tr. 1310.) And despite her never seeing Brown being physical with D.R., she stated, without objection, that he was "physically hitting me, * * * beating me, punching me, slapping me, whatever the case may be." (Tr. 1310.) She testified that D.R. was present one time when this happened to her.

{¶19} The jury found Brown guilty of trafficking in persons and compelling prostitution; and acquitted him of all the other charges relating to the murder. Pursuant to R.C. 2905.32(D), the trial court merged the two convictions, and the state elected that Brown be sentenced on Count 10, trafficking in persons. Pursuant to R.C. 2905.32(E), the court imposed a definite prison sentence of 13 years, and ordered that the prison sentence be served prior to and

consecutive with the five-year sentence imposed in Cuyahoga C.P. No. CR-16-611487. The trial court classified Brown as a Tier II sex offender based on the convictions in both cases.[2]

{¶20} Brown now appeals, raising eight assignments of error.

## I. Unanimous Verdict — Alternative Means v. Multiple Acts

{¶21} In his first assignment of error, Brown contends that the trial court committed plain error and violated his right to due process of law and a unanimous verdict pursuant to Crim.R. 31(A) when the jury found him guilty of trafficking in persons, where the jury instructions included all possible theories of the offense that could be committed by alternative means or multiple acts.

{¶22} Brown did not object to the jury instructions. Accordingly, this assignment of error is reviewed for plain error. Under Crim.R. 52(B), plain errors affecting substantial rights may be noticed by an appellate court even though they were not brought to the attention of the trial court. To constitute plain error, there must be (1) an error, i.e., a deviation from a legal rule, (2) that is plain or obvious, and (3) that affected substantial rights, i.e., affected the outcome of the trial. *State v. Barnes*, 94 Ohio St.3d 21, 27, 2002-Ohio-68, 759 N.E.2d 1240. Even if the error satisfies these prongs, appellate courts are not required to correct the error. *Id.*, citing Crim.R. 52(B). Appellate courts retain discretion to correct plain errors. *Id.* Courts are to notice plain error under Crim.R. 52(B), "'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *Id.*, quoting *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978).

---

[2] In *State v. Brown*, 8th Dist. Cuyahoga No. 106410, 2019-Ohio-527, this court reversed Brown's convictions and sex offender classification in Cuyahoga C.P. No. CR-16-611487, finding that because he was not advised at the time of his plea that he would be classified as a sex offender, Brown's plea was not knowingly, intelligently, or voluntarily made.

**{¶23}** Brown does not identify whether this case is an "alternate means" or a "multiple acts" case, contending that under either theory, his right to a unanimous verdict was violated. However, the distinction between the two types of cases is "meaningful" when deciding whether a verdict violates Crim.R. 31(A). *State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, 889 N.E.2d 995, ¶ 51.

**{¶24}** Supporting his argument that this case is a "multiple acts" case, Brown relies on this court's decision in *State v. Jackson*, 8th Dist. Cuyahoga No. 95920, 2011-Ohio-5920. However, this court recently distinguished *Jackson* by recognizing that the discussion of "alternative means" and "multiple acts" in *Jackson* was not necessary to resolve the appealed issue that the indictment was duplicative. *State v. McKinney*, 8th Dist. Cuyahoga No. 106377, 2019-Ohio-1118. Accordingly, the dicta in *Jackson* is not applicable to this appeal where Brown is challenging the instructions given to the jury and whether those instructions prevented the jury from reaching a unanimous verdict as required by Crim.R. 31(A) and the right to due process under the Fourteenth Amendment to the U.S. Constitution. *Gardner*.

**{¶25}** A criminal defendant is entitled to a unanimous verdict. Crim.R. 31(A). In *Gardner*, the plurality opinion of the Ohio Supreme Court stated, "[a]lthough Crim.R. 31(A) requires juror unanimity on each element of the crime, jurors need not agree to a single way by which an element is satisfied." *Id*. at ¶ 38, citing *Richardson v. United States*, 526 U.S. 813, 817, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999) (jury need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element — which of several possible means the defendant used to commit the element of the crime); *see also State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 290, citing *Gardner* at ¶ 49 (jury unanimity is not required as to the means underlying the offense so long as substantial evidence

supports each alternative mean). Although *Gardner* was a plurality opinion, its subsequent decision in *Adams* makes it clear that the Ohio Supreme Court still adheres to the juror unanimity rule stated in *Gardner*.

{¶26} The parties agree that the proper analysis to determine whether a defendant's Crim.R. 31(A) right has been violated is guided by *Gardner*, where "the law on juror unanimity distinguishes between the elements of the crime and the means by which a defendant commits an element." *Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, 889 N.E.2d 995, at ¶ 37. Accordingly, because the jury unanimity requirement in Crim.R. 31(A) has due process implications, the Ohio Supreme Court determined that "the critical inquiry is whether the case involves "alternative means" or "multiple acts." *Id*. at ¶ 48.

{¶27} "In an 'alternative means' case, where a single offense may be committed in more than one way, there must be jury unanimity as to guilt for the single crime charged. Unanimity is not required, however, as to the means by which the crime was committed so long as substantial evidence supports each alternative means. In reviewing an alternative means case, the court must determine whether a rational trier of fact could have found each means of committing the crime proved beyond a reasonable doubt." *Id*. at ¶ 49.

{¶28} However, in a "multiple acts" case, "several acts are alleged and any one of them could constitute the crime charged. In these cases, the jury must be unanimous as to which act or incident constitutes the crime. To ensure jury unanimity in multiple acts cases, we require that either the state elect the particular criminal act upon which it will rely for conviction, or that the trial court instruct the jury that all of them must agree that the same underlying criminal act has been proved beyond a reasonable doubt." *Id*. at ¶ 50.

{¶29} Simply put, in an alternative means case, juror unanimity is not required when there are alternative means or ways that an *element* of the offense could be committed. For example, the charge of rape contains the element of sexual conduct. The means by which that element is satisfied — either by vaginal rape, anal rape, or oral rape, does not require juror unanimity because all three means are, by definition, "sexual conduct." *Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, 889 N.E.2d 995, at ¶ 43, citing *State v. Thompson,* 33 Ohio St.3d 1, 514 N.E.2d 407 (1987). In this example, juror unanimity exists when a rational trier of fact could find each means of committing the crime proved beyond a reasonable doubt. *Id.*; *see also State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315 (alternative theories for the mens rea element of murder); *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31 (alternative predicate crimes that underlie aggravated murder; jurors need not agree on a single means for committing an offense); *State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239 (discussion of alternative means regarding aggravated burglary, menacing by stalking, and witness-murder specification).

{¶30} The Ohio Supreme Court further determined that its decision in *State v. Johnson*, 46 Ohio St.3d 96, 545 N.E.2d 636 (1989), recognized a different standard in a "multiple-acts" case. *Gardner* at ¶ 51-53. In *Johnson*, the court discussed the idea that "if a single count of an indictment can be divided into two or more 'distinct conceptual groupings,' the jury must be instructed specifically that it must unanimously find that the defendant committed acts within one conceptual grouping in order to reach a guilty verdict." *Johnson* at 104-105, quoting *United States v. Gipson*, 553 F.2d 453, 458 (5th Cir.1977). But if a single count can be divided into a "single conceptual grouping of related facts," no specific instruction is necessary, because in such a case, the alternatives presented to the jury are not conceptually distinct, and a "patchwork"

verdict is not possible. *Johnson* at 105; *see also Gardner* at ¶ 56 (recognizing distinct conceptual groups is viable and valuable for state courts in consideration of jury-unanimity questions).

**{¶31}** Thus, in a multiple acts case, the statutory language of the single offense itself sets forth multiple acts, or distinct conceptual groupings of how a defendant could commit the offense. *See State v. Triplett*, 7th Dist. Mahoning No. 17 MA 0128, 2018-Ohio-5405, ¶ 69. Therefore, the jury must be specifically instructed that it must unanimously find that the defendant committed act(s) within one conceptual grouping in order to reach a guilty verdict. For example, a defendant is charged for an offense that prohibits a person from receiving, concealing, storing, bartering, selling, or disposing of a known stolen vehicle. *Gipson* at 458-459. In this example, this offense involves two distinct conceptual groups — (1) "housing" stolen goods (receiving, concealing, and storing) and (2) the "marketing" of stolen goods (bartering, selling, and disposing). *Id*. Therefore, the jury must be specifically instructed regarding which act the defendant committed and that the verdict must be unanimous. *Id*. In a multiple acts case, either the state must elect the particular criminal act upon which it will rely for conviction, or the trial court must instruct the jury that all of them must agree that the same underlying criminal act has been proved beyond a reasonable doubt. *See generally Gardner*.

**{¶32}** Accordingly, to determine whether an offense involves "alternative means" or "multiple acts," this court must look at the language of the indictment, and determine whether it alleges multiple "distinct conceptual groupings" of acts. *Johnson* at 104.

**{¶33}** Brown was charged with trafficking in persons, in violation of R.C. 2905.32(A)(1). The indictment charged that on or about July 17, 2015 Brown:

did knowingly recruit, lure, entice, isolate, harbor, transport, provide, obtain, or maintain, or did knowingly attempt to recruit, lure, entice, isolate, harbor, transport, provide, obtain, or maintain Jane Doe and Dorian Brown knew that Jane Doe would be subjected to involuntary servitude or be compelled to engage in sexual activity for hire, engage in a performance that is obscene, sexually oriented, or nudity oriented, or be a model or participant in the production of material that is obscene, sexually oriented, or nudity oriented.

{¶34} In this case, the single offense of "trafficking in persons" could be committed by multiple acts that, when reviewed, involved two distinct conceptual groupings — either by (1) subjecting an individual to involuntary servitude, or (2) compelling an individual to engage in an action that is sexual in nature. "'Human trafficking can be either sex trafficking or labor trafficking.'" *See State v. Nelson*, 2017-Ohio-6883, 83 N.E.3d 1009, ¶ 55 (8th Dist.), quoting Rocha, *Our Backyard Slave Trade: The Result of Ohio's Failure to Enact Comprehensive State-Level Human-Sex Trafficking Legislation*, 25 J.L. & Health 381, 421 (2012). Accordingly, based on the language in the indictment, there must be jury unanimity as to the underlying act charged, and the jury should be specifically instructed or the state should elect which act the defendant committed.[3]

{¶35} As further evidence that this case is a multiple acts case, the punishment for each distinct conceptual grouping is different. *See, e.g., State v. James*, 698 P.2d 1161, 1165 (Alaska

---

[3]The Ohio Supreme Court noted that when faced with cases where the issue of alternative means and multiple acts arise, specific jury instructions "provide an important road map for the jury in its deliberations and help ensure that jurors focus on specific conduct that constitutes a criminal act." *Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, 889 N.E.2d 995, at ¶ 73. But specific instructions are not always necessary. "Trial judges are in the best position to determine the content of the instructions based on the evidence at trial and on whether the case presents an alternative means or multiple acts scenario." *Id*. at ¶ 74.

1985) (multiple punishment for the conduct charged is a factor in determining whether the statute describes a single offense or multiple offenses). As will be discussed under Brown's second assignment of error, a person convicted under the "involuntary servitude" portion of R.C. 2905.32(A)(1) is not subject to a sexual offender classification and registration requirements. However, a person convicted for committing conduct involving the sexual nature portion of R.C. 2905.32(A)(1) is subject to a Tier II sexual offender classification and registration requirements. This court has consistently determined that a sex offender classification under R.C. Chapter 2950 is punitive in nature, and that it is included as part of an offender's maximum sentence. *See, e.g., Brown*, 8th Dist. Cuyahoga No. 106410, 2019-Ohio-527, ¶ 7. Accordingly, without any specific instruction regarding which act constitutes a violation of R.C. 2905.32(A)(1), a person found guilty of the generic version of the statute would potentially be subject to a sex offender classification by operation of law when legally, the defendant did not commit a sexually oriented offense.

{¶36} Accordingly, under *Gardner*, the fact that some of the jurors might have found that Brown committed human trafficking in one way while others found that he committed it in another violated Crim.R. 31(A). Despite this violation, we decline to exercise our discretion and find plain error because notice of plain error is to be taken with utmost caution, under exceptional circumstances, and only to prevent a miscarriage of justice. *Long*, 53 Ohio St.3d 91, 372 N.E.2d 804, paragraph three of the syllabus.

{¶37} In this case, the evidence was overwhelming that the act by which Brown was trafficking in persons was sexual in nature. There appeared to be no juror confusion regarding this fact because the jurors also found Brown guilty of compelling prostitution, another sexual

offense. The only evidence presented was that the activity that D.R. was compelled to engage in was entirely sexual in nature. Accordingly, Brown's first assignment of error is overruled.

## II. Sex Offender Classification

{¶38} In his second assignment of error, Brown contends that the trial court erred when it classified him as a Tier II sex offender after he was generally convicted of trafficking in persons without additional findings. No objection was raised at the time of classification, and thus, we review for plain error, which will not be recognized unless exceptional circumstances exist and a miscarriage of justice will occur if plain error is not recognized.

{¶39} When S.B. 10 abolished the prior sexual offender classifications, the sex offender classifications under the new Adam Walsh Act, left little, if any, discretion to the trial court in classifying an offender. *See* R.C. 2950.01. Instead, R.C. 2950.01 requires the trial court to classify an offender based solely on his or her conviction. *Miller v. Cordray*, 184 Ohio App.3d 754, 2009-Ohio-3617, 922 N.E.2d 973 (10th Dist.) Depending on what crime the offender committed, the offender is placed in Tier I, II, or III. R.C. 2950.01(E)-(G). The tiers dictate what the registration and notifications requirements are.

{¶40} In this case, Brown was charged with R.C. 2905.32(A)(1), trafficking in persons. As already discussed, within this offense two distinct conceptual groupings arise — involuntary servitude and acts that are sexual in nature. The involuntary-servitude prohibition under R.C. 2905.01 does not necessarily require the compulsion of sexual acts. *See Nelson*, 2017-Ohio-6883, 83 N.E.30 1009, at ¶ 55, quoting *Our Backyard* at 421 ("'Human trafficking can be either sex trafficking or labor trafficking.'"). Indeed, this court explained that the historical roots of human-trafficking legislation stem from the intent to criminalize forced labor — "'[l]abor trafficking may consist of forced labor, debt bondage, involuntary domestic

servitude, and forced child labor.'" *Id.*, quoting *Our Backyard* at 421, citing 18 U.S.C. 1589 and 22 U.S.C. 7102. "As such, inherent in the definition of 'involuntary servitude' — 'being compelled to perform labor or services for another against one's will' — are the concepts underlying the labor-trafficking component of human trafficking." *State v. Logan*, 3d Dist. Allen No. 1-16-28, 2017-Ohio-8932, ¶ 16, *comparing* R.C. 2905.31(A) with 18 U.S.C. 1589 and 22 U.S.C. 7102(6).

{¶41} This is reflected by the plain and unambiguous language of R.C. 2950.01(F)(1)(g), which expressly omits "involuntary servitude" as a sexually oriented offense subject to a Tier II classification. Accordingly, it appears that rubber stamping the sex offender classification of an offender based on a statute or conviction alone leads to unintended or ambiguous consequences. Best practices would be for the state to separately indict individuals who are charged with trafficking in persons under "involuntary servitude" and then separately charge the other offenses where a sex offender classification can be maintained. Another option could be for the state to include a sexual motivation specification or separate finding for the jury to consider in these types of situations where the generic version of that statute provides separate punishments.

{¶42} Admittedly, if Brown was convicted of only the involuntary servitude portion of the statute, he would not be subject to a sex offender classification. However, the evidence that was presented to the jury at trial overwhelmingly supported that Brown's actions were sexual in nature, not merely for general forced human labor as the historical roots of involuntary servitude suggested. Accordingly, we decline to exercise our discretion to find plain error because no manifest injustice occurred.

{¶43} Brown's second assignment of error is overruled.

### III.   Sufficiency of the Evidence

**{¶44}** In this third assignment of error, Brown contends that the trial court erred in finding him guilty where the evidence presented at trial was insufficient to overcome his Crim.R. 29 motion and to support a conviction at the close of evidence.

**{¶45}** A Crim.R. 29 motion challenges the sufficiency of the evidence. The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. This court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Murphy*, 91 Ohio St.3d 516, 543, 747 N.E.2d 765 (2001). "'The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-829, 82 N.E.3d 1124, ¶ 12, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

**{¶46}** Brown was convicted of R.C. 2905.32(A)(1), trafficking in persons.[4] That offense generically provides:

> No person shall knowingly recruit, lure, entice, isolate, harbor, transport, provide, obtain, or maintain * * *
> (1) The offender knows that [D.R.] will be subjected to involuntary servitude or
>
> be compelled to engage in sexual activity for hire, engage in a performance that is
>
> obscene, sexually oriented, or nudity oriented, or be a model or participant in the
>
> production of material that is obscene, sexually oriented, or nudity oriented.

---

[4]We need not address the finding of guilt as to the compelling prostitution charge in Count 11 because that offense merged with the trafficking in persons offense in Count 10, and the state elected that Brown be sentenced on Count 10. *See State v. Ramos*, 8th Dist. Cuyahoga No. 103596, 2016-Ohio-7685, ¶ 14.

**{¶47}** Brown contends that prostitution by willing adults is not human trafficking, citing to this court's decision in *Nelson*, 2017-Ohio-6883, 83 N.E.30 1009, at ¶ 55. We agree that when a person decides to prostitute oneself, that is not trafficking in persons. However, when another individual takes an affirmative action to persuade, attract, or enable another, is actively involved in aiding in the act of prostitution, profits from another's prostitution, and exercises some dominion or control over the individual, that is trafficking in persons. *See generally Our Backyard.* Moreover, the statute does not contemplate that the victim must have knowledge that these events will occur. The victim's mental state is irrelevant; it is the mental state and intentions of the defendant that are the focus of the offense of trafficking in persons.

**{¶48}** Brown further maintains that D.R. voluntarily sought out and engaged in prostitution, and was free to leave at any time as the evidence showed at trial. His argument focuses on whether the evidence was sufficient to prove "force." However, R.C. 2905.32 does not contain the element of "force"; it only requires the act of "compulsion." R.C. 2905.32(B) specifically provides that "the element of 'compelled' does not require that the compulsion be openly displayed or physically exerted. The element of 'compelled' has been established if the state proves that the victim's will was overcome by force, fear, duress, intimidation, or fraud."

**{¶49}** Brown cites to this court's decision in *State v. Warren*, 8th Dist. Cuyahoga No. 102181, 2015-Ohio-3671, to support his position that his conduct was insufficient to support his conviction. He contends that, unlike in his case, Warren exercised "pimp control" over his victims by instilling fear through beating another girl in front of the victims, taking money and social security benefits from the victim, confiscating the victims' birth certificates, and by mentally and emotionally abusing the victims to the point of complete submission to his control. *Id.* at ¶ 38-40.

{¶50} Although the facts in *Warren* unequivocally demonstrate the crime of trafficking in persons at its worst, the facts in this case equally satisfy the elements of the offense; Brown's conduct will not be diminished because it is not the worst form of the offense.

{¶51} D.R. admitted that she initially voluntarily engaged in prostitution. However, over the course of a few weeks, she was overcome with fear and duress that if she left Brown, she would have no means to support herself or her son. She testified that he transported her to the state of Maryland, the city of Columbus, and different hotels in Northeast Ohio for the purposes of engaging in sexual activity. D.R. stated that initially Brown agreed to give her one-half of the money she earned; unlike what was occurring when she worked for Santana. The jury could reasonably infer that Brown enticed D.R. to work for him by agreeing to give her an equal share of the money and giving her a false sense that she would ultimately be able to provide for herself. However, the nature of the business relationship changed to the extent that Brown kept all the money. According to D.R., "it just kind of had me stuck there and I didn't really know what to do after that; I felt like I was in too deep." D.R. testified that Brown maintained and provided for her and her son; she depended on Brown to feed her son every day. In addition to the mental control Brown had over D.R., she also testified that on one occasion, he did use force when he grabbed her arm following an incident involving a tattoo. D.R. stated Brown's conduct made her feel "powerless."

{¶52} Therefore, while "force" in the physical aspect of the word may not have been prevalent, the evidence was sufficient that Brown enticed, maintained, and provided for D.R., knowing that she would be compelled to engage in sexual activity for continuation of that maintenance and support of herself and her son. Accordingly, viewing the evidence in the light

most favorable to the state, we find sufficient evidence was presented supporting Brown's conviction for trafficking in persons in violation of R.C. 2905.32(A)(1).

## IV. Manifest Weight of the Evidence

{¶53} In contrast to a sufficiency argument, a manifest weight challenge questions whether the state met its burden of persuasion. *Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. A reviewing court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 388, 678 N.E.2d 541 (1997). A conviction should be reversed as against the manifest weight of the evidence only in the most "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶54} Although we review credibility when considering the manifest weight of the evidence, we are cognizant that determinations regarding the credibility of witnesses and the weight of the testimony are primarily for the trier of fact. *State v. Bradley*, 8th Dist. Cuyahoga No. 97333, 2012-Ohio-2765, ¶ 14, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). The trier of fact is best able "to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 24. The jury may take note of any inconsistencies and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964).

{¶55} Brown contends in his fourth assignment of error that his conviction is against the manifest weight of the evidence. Brown does not argue this assignment of error separately; rather, he reincorporates the arguments raised challenging the sufficiency of the evidence. This court could summarily overrule the assignment of error on this basis alone. *See* App.R. 16, *State v. Cassano*, 8th Dist. Cuyahoga No. 97228, 2012-Ohio-4047, ¶ 2 (appellant must present an argument with respect to each assignment of error presented for review).

{¶56} Nevertheless, the jury's verdict demonstrates that it carefully considered all the evidence, weighed the credibility of the witnesses, reviewed the physical evidence, and followed the court's instructions in its deliberations. The weight of the evidence reveals that Brown was a pimp who exercised a certain dominion or control over the girls that worked for him. He enticed them to work for him by agreeing to give them half of their earnings, but changed the relationship once they relied on him to provide for them. In this case, D.R. testified that once Brown started taking all of her earnings, she felt that she was "in too deep" and "powerless."

{¶57} Accordingly, this is not the exceptional case where the evidence weighs against the verdict. The jury did not clearly lose its way or create a miscarriage of justice by finding Brown guilty of trafficking in persons.

{¶58} Brown's fourth assignment of error is overruled.

## V. Date Specificity

{¶59} In his fifth assignment of error, Brown contends that his conviction is not supported by sufficient evidence and is against the manifest weight of the evidence because no evidence was presented that he committed any act of trafficking persons on July 17, 2015, the date specified in the indictment. Typically, this type of argument is raised challenging the

sufficiency of the indictment, which must be done prior to trial. *See* Crim.R. 12(C). A review of the record reveals no objection was made to the indictment on this basis.

**{¶60}** As previously determined, Brown's conviction is supported by sufficient evidence and is not against the manifest weight of the evidence. Precise dates and times are not essential elements of an offense. *State v. Sellards*, 17 Ohio St.3d 169, 171, 478 N.E.2d 781 (1985). The "state does not need to prove the exact date of the offense, only that it occurred 'on or about' a certain date or within a certain time period." *State v. Mathis*, 8th Dist. Cuyahoga No. 83311, 2004-Ohio-2982, ¶ 18; *State v. Jones*, 8th Dist. Cuyahoga No. 92921, 2010-Ohio-902, ¶ 17 (sufficient evidence found where the offenses took place on a date reasonably near the specified "on or about" date). "[I]n a criminal charge the exact date and time are immaterial unless in the nature of the offense exactness of time is essential." *Id*., quoting *Tesca v. State*, 108 Ohio St. 287, 485, 140 N.E. 629 (1923), paragraph one of the syllabus.

**{¶61}** In this case, the indictment charged Brown with "trafficking in persons" on or about July 17, 2015. D.R. testified that she began prostituting for Brown from June until four or five days prior to July 17, 2015. During that time, she engaged in sexual activity in rooms that Brown reserved at an Econo Lodge and an America's Best Value Inn. Throughout these stays, Brown instructed other prostitutes to teach D.R. how to take photos and post ads. Additionally, D.R. testified that she would have three or four clients a day. Brown would collect the money that D.R. earned during these sexual encounters.

**{¶62}** There was no need to prove the offense occurred specifically on the date alleged; there was sufficient evidence to show the offense occurred reasonably before and on July 17, 2015. Additionally, R.C. 2905.32 does not require that the act of trafficking in persons for the purposes of engaging in sexual oriented activity needs to be an ongoing criminal enterprise; one

act is sufficient to satisfy the elements of trafficking in persons. *Compare Nelson,* 2017-Ohio-6883, 83 N.E.3d 1009, at ¶ 57 ("involuntary servitude" portion of trafficking in persons implies an ongoing offense, multiple acts, or multiple times. By holding this, however, the court is not establishing any particular time constraints in R.C. 2905.31(A)). In this case, the evidence showed that this was an ongoing offense where the exactness of the date was not essential for Brown to provide a meaningful defense.

**{¶63}** Brown's fifth assignment of error is overruled.

## VI. Witness Testimony

**{¶64}** Brown's jury trial was scheduled to begin on Monday, November 28, 2016. On Wednesday, November 23, 2016, the day before Thanksgiving, the state filed its notice of intent to present evidence pursuant to Evid.R. 404(B). Pursuant to the motion, the state intended to introduce Brown's prior bad acts to "show that [he] has a common plan, preparation, and motive" in "prey[ing] upon the vulnerability of young and minor girls." The state advised the court that it intended to introduce "other acts" evidence through the testimony of additional unnamed victims listed as "Jane Does" in a subsequent indictment filed on November 15, 2016, under Cuyahoga C.P. No. CR-16-611487, charging Brown not only with the crimes charged in the present case, but additional human trafficking offenses.

**{¶65}** On the first day of trial, defense counsel objected and moved to limit the state's intent to use Evid.R. 404(B) evidence because (1) the names of the potential witnesses were not disclosed and thus, Brown had no time to investigate the witnesses; and (2) the use of the testimony was improper Evid.R. 404(B) evidence.

**{¶66}** The trial court confirmed that the Jane Does 2-7 listed in the new indictment were in fact the potential Evid.R. 404(B) witnesses who were not previously listed on the state's

witness list and that these witnesses were only made known to defense counsel last week. The state admitted that it was "a lot of discovery," and the prosecutor had no expectation that the defense was able to review all of it.

{¶67} The state maintained that the "gist" of the testimony would be that the "Jane Does 2-7" worked for Brown and that he used "fear, force to compel the women to engage in prostitution, would take their money." (Tr. 56.) They expected the victim listed as Jane Doe 1 (D.R.) to testify that Brown did not give them their money and that the girls were subject to abuse or threat of abuse. The state also expected another "Jane Doe," D.B., who was disclosed on its witness list, would also testify to this effect.

{¶68} The state maintained that the use of the additional Jane Does "adds to the evidence of the human trafficking and the level of fear that was employed by Brown." The trial court hinted that the additional testimony would likely corroborate both D.R. and D.B.'s testimony.

{¶69} When questioned about the late disclosure, the stated maintained that (1) it did not know about the additional Jane Does, (2) there were safety reasons why disclosure was late, and (3) some of the Jane Does were underage at the time. The state admitted that only the initials of the Jane Does were provided to the defense; the names were redacted. The court questioned that the first time the defense would hear the actual names of the Jane Does would be at trial. The state indicated that the names and criminal records would be provided.

{¶70} The court recognized the unfairness to the defense in the late disclosure. The defense agreed and stated any other acts testimony given by the Jane Does would be in violation of Evid.R. 404(B) because the testimony would be overly prejudicial, and its use would support Brown's propensity that "he's a pimp who beats and threatens women."

{¶71} The state suggested that the issue be readdressed "when we get to it" because the state was unsure what D.R. and D.B. would testify about and "what other purposes the testimony of Jane Does 2-7 may be pertinent and relevant in this case." (Tr. 64.) The court agreed to preliminarily deny the motion in limine, but requested that it be reminded of this issue when, and if, any of the Jane Does were called to testify.

{¶72} During the middle of trial, and following D.R.'s testimony, the state placed on the record the names of Jane Does 2-7 — the state's "proposed 404(B) witnesses." (Tr. 966.) Included in that list was D.B., who the state disclosed was on the witness list for this case, and B.F., who was identified by D.R. and discussed during testimony.

{¶73} Following D.B.'s testimony, the state called B.F. as witness. The record is silent as to whether the parties discussed the admissibility of her testimony prior to being called, although later the state hinted that it announced the day prior that she would be testifying. After B.F. stated that she learned Brown was a pimp, defense counsel requested to approach the bench; the request was denied. Counsel then objected, which was overruled. Following B.F.'s next answer, counsel again objected, which was overruled. When the state questioned B.F. about whether Brown was "physically abusive or forceful" the court sustained another defense objection. However, no other objection was raised and the jury heard B.F. testify that B.F. left Brown because he "started to become something he wasn't" and "he kept putting hands on me by physically hitting me, beating me, punching me, and slapping me." (Tr. 1310-1318.) B.F. testified that D.R. was present on one occasion when this occurred, but that she never saw Brown being physical with D.R. (Tr. 1318.)

**{¶74}** Following B.F.'s testimony, defense counsel moved for a mistrial based partly on the court allowing B.F. to testify despite the discovery violation and improper Evid.R. 404(B) evidence.

**{¶75}** The state admitted that B.F. was not previously disclosed, and that her statement made to police was not given to counsel. However, the state explained that D.R. mentioned B.F. only in preparation for trial. However, the defense reminded the court that D.R. mentioned B.F. in her report given to Warrensville Heights police.

**{¶76}** The state maintained that B.F. was not only an other acts witness, but a fact witness, corroborating certain events that occurred during the time that D.R. was working for Brown. The state further asserted that B.F.'s testimony was proper under Evid.R. 404(B) because it demonstrated a common plan or scheme — the witness established the "element of force." (Tr. 1327.)

**{¶77}** The trial court denied Brown's motion for a mistrial, finding that although the state violated Crim.R. 16 discovery rules by not timely disclosing B.F. as a witness, B.F.'s testimony was outside the scope of Evid.R. 404(B).

**{¶78}** In response to the court's question regarding whether B.F.'s testimony should be stricken, the state maintained that the least restrictive sanction would be to give Brown a continuance to conduct any subsequent investigation, considering B.F.'s name was given at the start of trial. Defense counsel responded that only the initials of "B.F." were given at the start of trial; her name, statement, or background were never provided.

**{¶79}** The court denied Brown's motion to strike B.F.'s testimony, ruling that

> The ultimate purpose of this trial is to discern, as best as possible, the truth of what occurred in June and July 2015. To strike [B.F.'s] testimony in its entirety

would not serve that purpose. It would serve the purpose of sanctioning or punishing the executive branch for its failure to abide by the rules.

(Tr. 1333-1334.)

{¶80} Immediately before the jury was charged, the state advised the court that it had just provided to Brown's counsel B.F.'s police statement and criminal history. It further advised the court that the state offered the defense an opportunity to recall B.F. based on the new information, but that counsel declined. Defense counsel agreed with the state's assertions, but asked that the statement and background information be made part of the record for appeal purposes.

{¶81} Despite the trial court allowing B.F.'s testimony to remain part of the record and for the jury to consider, it did not give, nor did defense counsel request, any specific limiting instruction regarding the "other acts" evidence.

{¶82} In his sixth assignment of error, Brown contends that the trial court erred in permitting the trial testimony of B.F., who was not identified on the state's witness list, whose prior interview and statement were withheld from appellant's counsel, and whose testimony was overly prejudicial to appellant and in violation of Evid.R. 404(B).

## A. Discovery Violation

{¶83} After Brown discovered that the Evid.R. 404(B) evidence would be in the form of an undisclosed witness testifying, Brown filed a motion in limine to also exclude the testimony based on the state committing a Crim.R. 16 discovery violation. The court acknowledged the violation, but did not find it willful based on the representations made by the state. After B.F. testified, Brown moved for a mistrial partly because of the state's late disclosure of the actual

names of the potential Evid.R. 404(B) witnesses and because no statements or criminal history were provided to the defense prior to her testimony.

{¶84} The trial court found that the state violated Crim.R. 16 by failing to timely disclose B.F. as a witness. In fact, the trial court also found that the state violated Crim.R. 16 by failing to disclose another witness — FBI Special Agent Burke. In that instance, however, the trial court excluded Agent Burke's testimony as the sanction for its violation. However, no sanction was imposed regarding B.F., and she was allowed to testify and her testimony was not stricken from the record.

{¶85} Crim.R. 16, which governs discovery in a criminal case, provides that the purpose of the discovery rule is "to provide all parties in a criminal case with the information necessary for a full and fair adjudication of the facts, to protect the integrity of the judicial system and the rights of defendants, and to protect the well-being of witnesses, victims, and society at large." Crim.R. 16(A). The rule serves "'to prevent surprise and the secreting of evidence favorable to one party.'" *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 19, quoting *Lakewood v. Papadelis*, 32 Ohio St.3d 1, 3, 511 N.E.2d 1138 (1987). Pursuant to Crim.R. 16(I), "[e]ach party shall provide to opposing counsel a written witness list, including names and addresses of any witness it intends to call in its case-in-chief, or reasonably anticipates calling in rebuttal or surrebuttal." Additionally, pursuant to Crim.R. 16(B)(2) and (7), the prosecutor must provide the defense the criminal background information and written or recorded statements of any witness the state intends to call at trial.

{¶86} A trial court has broad discretion in regulating discovery and in determining a sanction for a discovery violation. *Darmond* at ¶ 33. When imposing a sanction, however, the trial court must inquire into the circumstances and impose the least severe sanction that is

consistent with the purpose of the rules of discovery. *Papadelis*, at paragraph two of the syllabus; *State v. Rucker*, 8th Dist. Cuyahoga No. 105628, 2018-Ohio-1832, ¶ 20.

{¶87} In determining the appropriate sanction, a trial court must consider the following three factors: (1) whether the failure to disclose was a willful violation of Crim.R. 16; (2) whether foreknowledge of the undisclosed material would have benefitted the accused in the preparation of a defense; and (3) whether the accused was prejudiced. *Darmond* at ¶ 35, citing *State v. Parson*, 6 Ohio St.3d 442, 453 N.E.2d 689 (1983), syllabus. A defendant is not prejudiced when an undisclosed witness's testimony is cumulative to what has been already testified to or does not come as a surprise to the defense. *State v. Thomas*, 8th Dist. Cuyahoga No. 81393, 2003-Ohio-2648, ¶ 12.

{¶88} In this case, the state put the defense on notice through its intent to use Evid.R. 404(B) other acts evidence that it intended to call at trial Jane Does 2-7. The identities of those witnesses or who would testify, however, were not made known to the defense until the middle of trial. The trial court acknowledged that the state violated Crim.R. 16, but found that a mistrial was not warranted and that striking B.F.'s testimony would serve no purpose. Accordingly, no sanction was imposed.

{¶89} Our review of the record demonstrates that the trial court did not abuse its discretion. By the time that B.F. testified, the jury had already heard testimony from both D.R. and D.B. regarding Brown's conduct and treatment toward the girls. B.F. testified about Brown's involvement in creating advertisements and his role in her prostitution. B.F. corroborated both D.R. and D.B.'s previously given testimony about Brown's change in the business operation by taking all of their money instead of splitting the money as originally promised. B.F. testified about the physical abuse that she suffered from Brown — abuse about

which D.B. previously testified. Additionally, D.R. heard an altercation between B.F. and Brown on one occasion. Accordingly, Brown was not surprised by B.F.'s testimony that he was abusive.

{¶90} Although Brown was not provided with B.F.'s statement to police and criminal background until after she testified, it was made part of the record for appeal purposes. Reviewing those documents, we find that the documents would not have been beneficial to Brown in preparation for his defense.

{¶91} Accordingly, even though the state violated Crim.R. 16, we find that the trial court did not abuse its discretion when it decided to not sanction the state by granting a mistrial or striking B.F.'s testimony based on the violation.

## B. Evid.R. 404(B)

{¶92} Brown also contends that B.F.'s testimony was not permissible under any exception to Evid.R. 404(B), and even if an exception existed, her testimony should have been precluded or stricken because any probative value was outweighed by unfair prejudice.

{¶93} "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987), paragraph two of the syllabus. "Evidence that an accused committed a crime other than the one for which he is on trial is not admissible when its sole purpose is to show the accused's propensity or inclination to commit crime, or that he acted in conformity with bad character." *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 15. However, there are exceptions that allow other acts of wrongdoing to be admitted.

{¶94} R.C. 2945.59 provides that:

In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.

{¶95} In addition, Evid.R. 404(B) provides that evidence of other crimes, wrongs, or acts is permitted to show proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or the absence of mistake or accident.

{¶96} In deciding whether to admit other acts evidence, trial courts should conduct a three-step analysis:

The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Evid.R. 401. The next step is to consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B). The third step is to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice.

*Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, at ¶ 20.

{¶97} In this case, the state's pretrial notice of intent explained that other acts evidence would be used to show motive, preparation, plan, or scheme.[5]   During trial, the state maintained that B.F.'s testimony was relevant and necessary to prove the element of "force" by showing that Brown engaged in a common plan, scheme, or motive.   Brown contends that the evidence was not used to prove a continued pattern of conduct, but offered solely to prove an element of the offense by showing conduct toward a separate individual.

{¶98} Applying the *Williams* factors, we agree with Brown.   Although B.F.'s testimony about Brown creating advertisements, taking pictures, and changing the payment arrangement was relevant, admissible to show plan, scheme, and pattern of conduct, and probative, B.F.'s testimony about Brown physically abusing her was used to prove impermissible character evidence that prompted the jury to concluded that if Brown physically abused B.F., he must have abused D.R.   Moreover, this prejudicial testimony outweighed any probative value.

{¶99} B.F. testified that she never witnessed Brown physically abuse anyone, including D.R.   This testimony was corroborated by D.B.   Therefore, Brown's conduct of physically assaulting B.F. did not support a common plan, scheme, motive, or plan; the testimony about abuse was only used to prove that Brown was a bad person, an improper purpose of other acts evidence.

{¶100} Reviewing this testimony in isolation, it appears egregious and prejudicial. However, this case was a murder trial where Brown was alleged to have orchestrated two men to rob two women, with an unintended victim getting shot and killed.   Accordingly, when viewed in the context of the entire trial, we find B.F.'s entire testimony harmless.   The use of "force"

---

[5]No argument has been raised on appeal that the state did not adhere to its pretrial notice of its intention to use other acts evidence to prove plan, preparation, motive, or scheme.

itself is not an element to the offense of "trafficking in persons"; rather, the element is "compelled." R.C. 2905.32(B) specifically provides that "the element of 'compelled' does not require that the compulsion be openly displayed or physically exerted. The element of 'compelled' has been established if the state proves that the victim's will was overcome by force, fear, duress, intimidation, or fraud."

{¶101} Based on D.R.'s own testimony, sufficient evidence was presented that the "compelled" element was satisfied. D.R. testified that Brown's withholding of her money "just kind of had me stuck there and I didn't really know what to do after that; I felt like I was in too deep." She stated that Brown maintained and provided for her and her son; she depended on Brown to feed her son every day. In addition to the mental control Brown had over D.R., she also testified that on one occasion, he used physical force when he grabbed her arm following an incident involving a tattoo. D.R. stated that Brown's conduct made her feel "powerless." This testimony, alone, was sufficient for the jury determine that the state proved the element of "compulsion" beyond a reasonable doubt. B.F.'s testimony was not necessary and we cannot say that her testimony contributed to Brown's conviction.

{¶102} As an aside, we note that counsel could have renewed his objection or motion in limine prior to B.F. testifying to remind the trial court about the "bridge" that it was going to cross when the situation arose. The trial court admitted that its mode of conducting trials may have inhibited the defense from raising a proper objection prior to B.F. testifying. Counsel must be vigilant in preserving the record and a defendant's arguments for appellate review. However, a trial court should not be so strict in its manner of conducting trials to allow counsel to be effective.

{¶103} Brown's sixth assignment of error is overruled.

### VII. Consecutive Sentences

**{¶104}** In his seventh assignment of error, Brown contends that the trial court erred when it ordered his sentence to be served consecutively to the sentence imposed in Cuyahoga C.P. No. CR-16-611487. In *Brown*, 8th Dist. Cuyahoga No. 106410, 2019-Ohio-527, this court reversed his convictions in Cuyahoga C.P. No. CR-16-611487 and remanded the case for further proceedings. Accordingly, the assignment of error is moot.

### VIII. Effective Assistance of Counsel

**{¶105}** Brown contends in his eighth assignment of error that he was denied effective assistance of counsel when, counsel failed to object to the (1) improper jury instruction given on Count 10, trafficking in persons, and (2) the sex offender classification.

**{¶106}** To establish ineffective assistance of counsel, a defendant must demonstrate (1) that counsel's performance fell below an objective standard of reasonable representation and (2) that he was prejudiced by that performance. *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Prejudice is established when the defendant demonstrates "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 694.

**{¶107}** The failure to prove either prong of the *Strickland* two-part test makes it unnecessary for a court to consider the other prong. *State v. Madrigal*, 87 Ohio St.3d 378, 388-389, 721 N.E.2d 52 (2000), citing *Strickland* at 697. "In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. * * * If it is easier to dispose of an

ineffectiveness claim on the ground of lack of sufficient prejudice * * * that course should be followed." *Strickland* at *id.*

{¶108} Brown summarily asserts that if this court denies him relief based upon any failures by counsel, this court should review those failures as ineffective assistance of counsel. This request is contrary to App.R. 16(A)(7) that requires each assignment of error to be argued separately. Moreover, even if counsel was deficient in failing to object to the jury instruction or subsequent sex offender classification, Brown does not demonstrate how that deficiency sufficiently prejudiced him to reverse his conviction. In spite of counsel's failure to object to the jury instruction, it cannot be said that the jury verdict would have been different. The same is also true for the sex offender classification; he was not prejudiced. In declining to find plain error regarding Brown's sex offender classification, we implicitly found no prejudice. *See, e.g., State v. Tabor*, 4th Dist. Jackson No. 16CA9, 2017-Ohio-8656, ¶ 24 (to find plain error an express finding of prejudice is required). Even if counsel objected, it cannot be said that the outcome would have been different.

{¶109} Accordingly, we find that Brown was not deprived of effective assistance of counsel. Brown's eighth assignment of error is overruled.

{¶110} Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the

Rules of Appellate Procedure.


_____
KATHLEEN ANN KEOUGH, JUDGE

EILEEN A. GALLAGHER, P.J., and
LARRY A. JONES, SR., J., CONCUR