[Cite as *State v. Johnson*, 2020-Ohio-2940.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | No. 108621 |
| v. | : | |
| KYLE JOHNSON, | : | |
| Defendant-Appellant. | : | |

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** May 14, 2020

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-18-635675-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Brian D. Kraft, Assistant Prosecuting Attorney, *for appellee.*

Robert A. Dixon, *for appellant.*

MICHELLE J. SHEEHAN, J.:

{¶ 1} Plaintiff-appellant Kyle Johnson ("Johnson") appeals from his convictions for murder, felonious assault, improperly discharging a firearm, and having weapons while under disability. Because we find the trial court did not abuse its discretion when it denied Johnson's motion for a mistrial, the trial court properly

denied Johnson's request for jury instructions on the lesser included offense of involuntary manslaughter, and the convictions are not against the manifest weight of the evidence, we affirm.

## I. Procedural History

{¶ 2} On December 28, 2018, Johnson was charged in a multiple count indictment that stems from the shooting death of Emmanuel Hicks ("Hicks" or "the victim"). The indictment charged as follows: Count 1 — aggravated murder in violation of R.C. 2903.01(A); Count 2 — aggravated murder in violation of R.C. 2903.01(B); Count 3 — murder in violation of R.C. 2903.02(B); Count 4 — aggravated burglary in violation of R.C. 2911.11(A)(2); Count 5 — aggravated robbery in violation of R.C. 2911.01(A)(3); Count 6 — felonious assault in violation of R.C. 2903.11(A)(1); Count 7 — improperly discharging into habitation in violation of R.C. 2923.161(A)(1); Count 8 — discharge of firearm on or near prohibited premises in violation of R.C. 2923.162(A)(3); Count 9 — felonious assault in violation of R.C. 2903.11(A)(2); and Count 10 — having weapons while under disability in violation of R.C. 2923.13(A)(2).

{¶ 3} With the exception of Count 10, all of the charges included one-year, three-year, and 54-month firearm specifications. Counts 4-7 and Count 9 included a notice of prior conviction specification as well as a repeat violent offender specification.

{¶ 4} On April 1, 2019, the matter proceeded to a jury trial, with the exception of the having weapons while under disability count, notice of prior

conviction specifications, repeat violent offender specifications, and 54-month firearm specifications, which were tried to the bench. Following the defense's Crim.R. 29 motion for acquittal, the trial court dismissed the aggravated robbery charge. The jury found Johnson guilty of murder, the lesser included offense under Count 1; murder in Count 3; both felonious assault charges; improperly discharging into habitation; and discharge of a firearm on or near prohibited premises. The jury also found Johnson guilty of the attendant one- and three-year firearm specifications. The jury found Johnson not guilty of aggravated murder in Count 2 and aggravated burglary in Count 4. Thereafter, the trial court found Johnson guilty of having weapons while under disability. The court also found Johnson guilty of the relevant notice of prior conviction specifications, repeat violent offender specifications, and 54-month firearm specifications.

{¶ 5} On April 30, 2019, the court held a sentencing hearing, during which the parties agreed that Count 1 (murder), Count 3 (murder) and renumbered Count 5 (felonious assault) merge and that renumbered Count 6 (improperly discharging into habitation), renumbered Count 7 (discharging firearm on or near prohibited premises), renumbered Count 8 (felonious assault), and renumbered Count 9 (having weapons while under disability) do not merge. The state then requested the court to sentence on Count 1 and each of the remaining counts.

{¶ 6} Thereafter, the court imposed the following sentence: Count 1 — 15 years to life in prison, plus the 54-month firearm specification (in which the one- and three-year firearm specifications are merged), to be served prior to and

consecutive to the underlying offense; Count 6 — six years in prison, plus the 54-month firearm specification (which was merged with the one- and three-year firearm specifications), to be served prior to and consecutive to the underlying offense; Count 7 — three years in prison, plus the 54-month firearm specification (which was merged with the one- and three-year firearm specifications), to be served prior to and consecutive to the underlying offense; Count 8 — eight years in prison, plus the 54-month firearm specification (which was merged with the one- and three-year firearm specifications), to be served prior to and consecutive to the underlying offense; and Count 9 — three years in prison. The court then ordered the firearm specifications in Counts 1 and 6 as well as the underlying offenses in Counts 1, 6, and 9 to run consecutive to each other, and the court ordered the sentences in Counts 7 and 8 to be run concurrent with all other counts. The total prison sentence is 33 years to life.

{¶ 7} Johnson now appeals his conviction, assigning three errors for our review:

I. The lower court erred and denied the appellant due process of law and a fair trial when it denied the defense motion for a mistrial based upon the failure of the state to provide timely discovery.

II. The lower court erred and denied the appellant his right to due process and a fair trial when it refused the defense request to charge the jury on the lesser offense of involuntary manslaughter pursuant to R.C. 2903.04(B).

III. The verdict and judgment below finding the appellant guilty of murder was against the manifest weight of the evidence.

## II. Substantive Facts

{¶ 8} Police were dispatched to the residence of Emmanuel Hicks on Edmonton Avenue in Cleveland, Ohio, on the evening of November 5, 2017, for shots fired. Cleveland police sergeant John Lally testified that police simultaneously received another call for shots fired into a house on E. 125th Street, approximately four or five houses away from the home on Edmonton Avenue, "across the street, on the south side of the street."

{¶ 9} Darren Robinson, a Cleveland police detective with the crime scene unit, arrived at the scene of the homicide on Edmonton Avenue, conferring with officers on the scene, collecting evidence, and photographing evidence. Upon entering the front porch, Detective Robinson observed a camera surveillance system. Inside the home, he observed a turned-over table and chair and the victim, Hicks, lying face down on his living room floor, near a sofa. Hicks had died of apparent multiple gunshots.

{¶ 10} Detective Robinson also observed blood on the floor, wall, and table, and a cell phone on the table, a semiautomatic firearm in a cabinet, apparent "defects," or holes caused by a bullet, in a chair and the wall, sandwich bags, a Mason jar, and a spent .40 caliber casing near the victim. He further observed blood on the victim's hand, chest, and stomach area, suspected marijuana on and near the victim, and a 9 mm handgun in the victim's pocket. Detective

Robinson took samples of the blood in the home using sterile swabs to collect potential DNA evidence.

{¶ 11} Cleveland police homicide detective David Shapiro was also dispatched to the shooting on Edmonton Avenue. He worked with Detective Robinson to collect evidence from the scene. Detective Shapiro testified that he and other detectives on the scene removed a camera surveillance system that consisted of a DVR recorder and four cameras, and he forwarded the surveillance system to the FBI for assistance extracting video from the system. While on the scene, Detective Shapiro also recovered a firearm in a dining room cabinet, a cell phone, and approximately $500 in cash on the victim. The detective then interviewed Hicks's upstairs neighbors, William Martin and Deanna McShan.

{¶ 12} Martin testified that Hicks made money selling marijuana, Hicks had previously been robbed, and he had a camera surveillance system. Martin further testified that on the evening of November 5, 2017, he was playing cards with Deanna McShan and others in his home when he heard a "big rumble" that sounded like "something may have fallen over downstairs." He then heard gunshots and felt vibrations, which caused him to believe the shots came from inside the house. After the shots ceased, he called Hicks. When Hicks did not answer, Martin went downstairs to check on Hicks and discovered Hicks lying partially on the sofa and partially on the floor. Martin also saw "a lot of marijuana * * * all over the floor." He checked for Hicks's pulse and found none.

{¶ 13} Deanna McShan testified that she was playing cards with Martin when she heard "a lot of commotion," including "tussling" and cussing. She then heard something fall, and she heard gunshots. She, too, phoned Hicks after the gunshots. When Hicks did not answer, she went downstairs and discovered Hicks lying on the floor, "leaning" on the sofa. She also observed broken furniture, "a lot of marijuana on the floor," and the victim's cell phone. McShan phoned 911.

{¶ 14} While on the scene at E. 125th Street on November 5, 2017, Sergeant Lally spoke with the residents of the home. He observed wooden splinters in the male resident's body and a "defect" in a kitchen cabinet. Sergeant Lally testified that although he did not observe an entrance defect outside of the home, he believed the shooting at Edmonton Avenue was related to the shooting at E. 125th Street.

{¶ 15} Brian Dixon ("Brian") lived on E. 125th Street with his mother, Denise Dixon ("Denise"). Brian testified that on the evening of November 5, 2017, he was preparing dinner in his kitchen when he heard an explosion and then felt "wood particles" from a cabinet hit his face. He then observed a bullet hole "from the back of the house through * * * the cabinet into the bathroom." Denise testified that on that evening, she was lying on the sofa in the living room when her son ran into the living room holding his face. She observed "fragments of the wood from [the] cabinet * * * all stuck in [her son's] face." Denise observed a bullet hole in her cabinet. She then phoned 911, not knowing what happened.

{¶ 16} Christina Suther, a digital forensics examiner with the FBI, extracted video from the DVR recovered at the crime scene on Edmonton Avenue. She then stored the video, which came from four different cameras on the exterior of the victim's home, in one-hour increments on discs and delivered them to the police investigators.

{¶ 17} FBI agent Andrew Burke assisted the Cleveland police department with the homicide investigation, specifically analyzing video surveillance footage taken surrounding the time of the homicide. Agent Burke testified regarding the contents of the surveillance footage, which included video from two porch cameras (one facing east and the other facing west) and two cameras on each side of the house, facing south toward Edmonton Avenue (one camera on the east side of the house and the other on the west side).

{¶ 18} The video shows a male with a distinct neck tattoo, whom Agent Burke later identified as the defendant, Kyle Johnson, standing on Hicks's porch. After a period of time, Hicks apparently "buzzes" Johnson inside, and Johnson is no longer in view of the camera. While Johnson is inside Hicks's home, another male steps onto the porch and waits to be buzzed inside. As he waits, the video shows the male exhibit a look of surprise on his face and he jumps off the porch and runs away. Shortly thereafter, Johnson exits the victim's residence and appears to be tucking a firearm under his arm. Johnson then wipes the door handle with his jacket sleeve, jumps off of the porch, and discharges his firearm behind him as he runs to a car that is waiting approximately three houses away on the south side of

the street. As Johnson is shooting, the video shows an unidentified male standing by a tree near the vehicle Johnson later enters. This individual also shoots down the street. Both Johnson and the unidentified male leave the scene in the same vehicle.

{¶ 19} Law enforcement obtained Johnson's cell phone records. FBI Special Agent Jacob Kunkle, a member of the cellular analysis survey team that specializes in locating phones and devices based on their records, performed a cell site analysis of Johnson's cell phone for the period of November 2, 2017, through November 8, 2017. He testified that Johnson's cell phone was in the "general vicinity to the northwest of" Hicks's home surrounding the time of the homicide. Additionally, Agent Burke obtained the extraction report from Hicks's cell phone, and he determined that a call from Johnson's phone was made to Hicks's phone shortly before the homicide.

{¶ 20} Dr. David Dolinak, Cuyahoga County's deputy medical examiner, conducted an autopsy of Hicks and determined that Hicks died as a result of three gunshot wounds. Daniel Mabel, forensic scientist with the Cuyahoga County medical examiner's office examined Hicks's body. He collected samples from the body, including samples from Hicks's hands, he examined the victim's clothing, and he examined a gunshot residue collection kit in relation to the shooting. Mabel's examination revealed that Hicks had been shot at close range.

{¶ 21} Carey Baucher, a DNA analyst with the county medical examiner's office, examined evidence collected by Dr. Dolinak and Daniel Mabel in November 2017, and she included this evidence in her initial report dated

September 5, 2018. Baucher also prepared a supplemental report on November 7, 2018, that addressed the evidence provided by the police department in December 2017: the buccal swab from the suspect at the time, Kyle Johnson. Baucher testified that upon examination, Johnson's DNA was discovered under the fingernail of Hicks's right hand.

### III. Motion for Mistrial

{¶ 22} In Johnson's first assignment of error, he contends the trial court denied him due process of the law and a fair trial when it denied his motion for a mistrial. In support, Johnson argues that the state's failure to provide timely discovery, namely surveillance video footage of the victim's front porch, caused prejudice because it impacted the defense theory presented in opening statement and upon cross-examination and therefore a mistrial was warranted.

{¶ 23} Trial courts enjoy broad discretion in ruling on motions for mistrial. *State v. Iacona*, 93 Ohio St.3d 83, 100, 752 N.E.2d 937 (2001). Absent an abuse of discretion, a reviewing court will not reverse a trial court's decision regarding a motion for a mistrial. *State v. Benson*, 8th Dist. Cuyahoga No. 87655, 2007-Ohio-830, ¶ 136. An abuse of discretion "connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 24} A mistrial should not be ordered in a criminal case "merely because some error or irregularity has occurred, unless the substantial rights of the

accused or the prosecution are adversely affected." *State v. Wilson*, 8th Dist. Cuyahoga No. 92148, 2010-Ohio-550, ¶ 13, citing *State v. Reynolds*, 49 Ohio App.3d 27, 33, 550 N.E.2d 490 (2d Dist.1988). Thus, a trial court should declare a mistrial "only when the ends of justice so require and a fair trial is no longer possible." *State v. Franklin*, 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991), citing *Illinois v. Somerville*, 410 U.S. 458, 462-463, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973). The essential inquiry on a motion for mistrial therefore is whether the substantial rights of the accused or the prosecution are adversely or materially affected. *Wilson* at ¶ 13, citing *State v. Goerndt*, 8th Dist. Cuyahoga No. 88892, 2007-Ohio-4067, ¶ 21.

{¶ 25} In this case, the defendant moved for a mistrial based upon the prosecution's failure to disclose evidence, in violation of the rules of discovery.

{¶ 26} Crim.R. 16, which governs discovery, requires the prosecuting attorney to provide copies or photographs, or permit counsel for the defendant to copy or photograph, certain items related to the case and are material to the preparation of a defense or are intended for use by the prosecuting attorney as evidence at the trial. Crim.R. 16(B). The purpose of the rule is "to provide all parties in a criminal case with the information necessary for a full and fair adjudication of the facts, to protect the integrity of the justice system and the rights of defendants, and to protect the well-being of witnesses, victims, and society at large." Crim.R. 16(A). This rule serves to "'prevent surprise and the secreting of evidence favorable to one party.'" *State v. Darmond*, 135 Ohio St.3d 343, 2013-

Ohio-966, 986 N.E.2d 971, ¶ 19, quoting *Lakewood v. Papadelis*, 32 Ohio St.3d 1, 3, 511 N.E.2d 1138 (1987).

{¶ 27} A mistrial is not mandated where a discovery violation occurs. *State v. Muszynec*, 8th Dist. Cuyahoga No. 87447, 2006-Ohio-5444, ¶ 16. Indeed, a trial court has broad discretion in regulating discovery and in determining a sanction for a discovery violation. *State v. Brown*, 2019-Ohio-1235, 134 N.E.3d 783, ¶ 86 (8th Dist.), citing *Darmond* at ¶ 33. When imposing a sanction for a discovery violation, however, "the trial court must conduct an inquiry into the surrounding circumstances and impose 'the least severe sanction that is consistent with the purpose of the rules of discovery.'" *State v. Rucker*, 2018-Ohio-1832, 113 N.E.3d 81, ¶ 20 (8th Dist.), quoting *Papadelis* at paragraph two of the syllabus.

{¶ 28} In determining the appropriate sanction, a trial court must consider whether (1) the prosecution's failure to disclose was willful, (2) the disclosure of the information prior to trial would have aided the accused's defense, and (3) the accused suffered prejudice. *State v. Lindsey*, 8th Dist. Cuyahoga No. 106111, 2019-Ohio-782, ¶ 48, citing *State v. Jackson*, 107 Ohio St.3d 53, 79, 2005-Ohio-5981, 836 N.E.2d 1173, citing *State v. Parson*, 6 Ohio St.3d 442, 445, 453 N.E.2d 689 (1983). We review a trial court's sanction for a discovery violation for an abuse of discretion. *Rucker* at ¶ 20.

{¶ 29} Here, the victim's video surveillance system was collected by law enforcement during its investigation. On approximately the third day of trial, the parties discovered that the defense did not have possession of all of the camera

angles of the victim's camera surveillance system, evidence which the state intended to produce at trial. The state explained the circumstances surrounding the delayed discovery:

> [O]riginally, a hard drive surveillance footage was seized from the house of Emanuel Hicks. That hard drive was ultimately sent [out] to the FBI where they were able to obtain a password for that hard drive and they were able to pull raw footage from that drive ("raw" footage or "extended" footage, which is footage that includes the time of the incident and hours and days both before and after the incident). That raw footage was placed on a series of, I believe, 100 disks with four camera angles.
>
> Two of the camera angles captured the front porch of this residence. Two of the camera angles are on the sides of the house facing toward the street.
>
> All of those disks, the 100 disks were provided to me in the form of two spindles, a total of 200 disks. I provided one of the spindles to defense counsel and I kept the other.
>
> My mistake — and this mistake wasn't known to either party I don't think until today — was that those spindles were not properly divided in terms of what the evidence was. Meaning my spindle captured two of the camera angles and the other spindle had two of the other camera angles in duplicative forms, I guess.
>
> From the beginning of this case, Your Honor, defense counsel has had select video footage from the porch, meaning defense counsel has had, let's call it camera angle A and camera angle B from the actual porch of the time period in question.
>
> * * *
>
> Defense counsel does, however, have — defense counsel does — in the form of the spindles does have camera angle C in raw form. The only camera angle that defense counsel has not seen is camera angle D (also referred to as "Camera 4" or "Angle 4"), which is a camera angle on the side of the house facing towards the street, which has been reviewed by law enforcement and nothing was captured on that camera angle during the time of this incident.

{¶ 30}     The state further explained that "when this mistake came to [his] attention [the morning of trial] in looking through the raw footage," he brought the matter to defense counsel's attention. The prosecutor suggested a review of the footage "so defense counsel can be satisfied that nothing appears on that raw angle D for him to consider." The prosecutor opined that there was nothing exculpatory in the newly revealed discovery material.

{¶ 31}     Defense counsel acknowledged possession of three of the four camera angles and the prosecutor's inadvertence. He then requested exclusion of the new evidence:

> Apparently, there was an inadvertent mistake made by the State in this matter. We would ask that nothing that was provided prior to, you know, during discovery period in this case be allowed to be admitted into court in this case.
>
> There was a camera angle I did not know existed that I'm receiving now. And could be that I could argue certain things, but I planned on arguing certain things about the absence of a camera angle that now I'll be precluded from arguing by given this late evidence that's been in the State's position, I would imagine since I think March of last year, March of 2018.
>
> So we would ask that that evidence be precluded. It's the third day of trial. I have not seen that camera angle. I do have two camera angles in my spindle. I have also received a condensed version of the — both porch angles of the time in question. I've had that. I've introduced that and put that into my theory of the case. But as far as these other angles I'm just receiving, we would ask that at this late juncture the Court preclude that angle from being admitted into court.

{¶ 32}     Defense counsel further clarified:

> There's one porch angle that I've only received the condensed version of the alleged time in question in this case. There's raw footage from

the camera that was directly above the door that I did not know existed either that they have had * * * In regards to the other angle, camera D you said, camera D or camera four, I have not received any raw footage, did not know there was any raw footage from that angle at all.

{¶ 33} Thereafter, the court recessed for approximately 40 minutes in order for the defense to review the CD containing the "raw" footage not previously disclosed. After reviewing the new CD, the defense stated that they reviewed approximately 30 minutes of the video, which included the portion of the time of the murder, but there were "literally days of video" that they did not have the time to review. Defense counsel therefore reiterated its request for the court to preclude the state from producing this video during trial. While acknowledging the state's failure to disclose the video was "inadvertence," defense counsel argued that introducing this evidence now would prejudice Johnson because the defense can no longer advance its initial theory of defense, which consisted of attacking law enforcement's investigation of the homicide. The defense argued that were the court to allow the video to be introduced now, the "credibility" of the defense would be affected.

{¶ 34} The court recessed once again, this time for almost an entire day, allowing defense counsel "to review the footage that they had not received [—] the raw footage and the condensed footage." When the court reconvened the following morning, the prosecutor explained once again the circumstances surrounding the discovery of the video containing the camera angle of raw footage that had never been revealed to the defense. The prosecutor confirmed that defense counsel always

had the two angles obtained from the porch cameras, which included the footage surrounding the homicide, and one angle obtained from the "one side of the house angle in its raw full form." The prosecutor explained that the defense "had every hour of the date in question and then had even additional days of that one camera angle" and the only angle the defense had been missing was the raw footage of the angle from the other side of the house. Defense counsel advised the court that he received "several days" of footage for review during the recess and he reviewed the footage "yesterday all day," including "hours before and hours after when it appears the murder took place." Counsel noted, however, that he could not "review several days of footage in one day."

{¶ 35} After providing additional time for the parties to address their concerns, the court determined that the state's failure to disclose was not a willful violation of the discovery rules and there was "no bad faith or intentional concealment or anything of that nature by the [s]tate." The court also concluded that the defense was not prejudiced by the late disclosure:

> Obviously, the defense is arguing that there's a benefit, that there would be a benefit of an earlier disclosure of this angle. However, the Court did give a lengthy continuance, as I indicated yesterday, starting at 10:15, 10:20 yesterday morning going into today. Now it's 9:10. But a considerable period of time for the defense to be able to review the evidence that was not produced. And so that goes to really any prejudice from the delayed disclosure.
>
> And so I believe that that period of time from yesterday until today — and the defense did indicate that they were able to review that angle — would eliminate any prejudice from that as well.

{¶ 36} The court then excluded all of the raw video footage not previously disclosed to the defense but permitted the state to introduce the raw footage for the camera angle not previously provided only for the period of time surrounding the homicide.

{¶ 37} Later in the trial, the defense formally moved for a mistrial because of the state's discovery violation on two bases: (1) not having the video evidence prior to trial hampered the ability to prepare a defense, and (2) allowing the evidence now "would in effect make us ineffective counsel because we had gone down a certain road that we can no longer go down to the same extent because of the admission of this evidence." The trial court denied the motion for a mistrial, incorporating its previous conclusion regarding the discovery violation and further stating that the defense had an opportunity to review the discovery, some of which the court did exclude, and "the time frame that the defense had to review it cured the issue." Finally, the court reiterated that the state's nondisclosure was not a willful violation.

{¶ 38} In light of the foregoing, we cannot say that the trial court abused its discretion in denying Johnson's motion for a mistrial. The record clearly demonstrates that the prosecution's failure to disclose the CD containing the raw footage of the camera angle from the side of the house was not willful. The prosecution provided the defense with what it believed to be discs of all of the camera angles obtained from the victim's surveillance camera, only to learn during

trial, at the same time as the defense, that it mistakenly failed to provide a copy of a disc containing the camera angle from one side of the house.

{¶ 39} And while the defense would likely have benefitted from learning of the existence of this camera angle, we find little, if any, evidence of prejudice. The court provided defense counsel two opportunities to review the video, counsel acknowledged he reviewed "hours" of the video, including the footage from "hours before and hours after" the homicide, and the trial court excluded the video containing the raw footage that the defense had not previously received, with the exception of the raw footage for the period of time surrounding the homicide. Moreover, the record demonstrates that the defense had always been in possession of the two angles obtained from the porch cameras, which included the footage surrounding the homicide, and one angle from one side of the street in raw form. The potential for the "credibility" of counsel to be affected in producing this newly revealed camera angle, as defense counsel urges, does not necessarily mean the substantial rights of the accused had been affected. Thus, "the ends of justice" did not "so require" a mistrial in this case. *Franklin*, 62 Ohio St.3d at 127, 580 N.E.2d 1, citing *Somerville*, 410 U.S. at 462-463, 93 S.Ct. 1066, 35 L.Ed.2d 425.

{¶ 40} Johnson's first assignment of error is overruled.

IV. Lesser Included Offense Instruction

{¶ 41} In his second assignment of error, Johnson contends that the trial court improperly denied his request to instruct the jury on the lesser included offense of involuntary manslaughter.

{¶ 42} Involuntary manslaughter (R.C. 2903.04) is a lesser included offense of aggravated murder with prior calculation and design (R.C. 2903.01(A)), aggravated felony murder (R.C. 2903.01(B)), and murder (R.C. 2903.02). *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 79, citing *State v. Thomas*, 40 Ohio St.3d 213, 533 N.E.2d 286 (1988), paragraph one of the syllabus. A lesser included offense instruction is not warranted, however, every time "some evidence" is presented to support the lesser offense. *State v. Shane*, 63 Ohio St.3d 630, 632, 590 N.E.2d 272 (1992). Rather, "a charge on a lesser included or inferior offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included or inferior offense." *State v. Carter*, 2018-Ohio-3671, 119 N.E.3d 896, ¶ 59 (8th Dist.), citing *Thomas* at paragraph two of the syllabus. Therefore, a court must find there is sufficient evidence to allow a jury to reasonably reject the greater offense and find the defendant guilty on the lesser included or inferior offense. *Shane* at 632-633. And in determining whether lesser included or inferior offense instructions are appropriate, the trial court must view the evidence in the light most favorable to the defendant. *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 37.

{¶ 43} Here, defense counsel requested an instruction on the lesser included offense of involuntary manslaughter under R.C. 2903.04(B). That statute provides that

[n]o person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a misdemeanor of any degree, a regulatory offense, or a minor misdemeanor other than a violation of any section contained in Title XLV of the Revised Code that is a minor misdemeanor and other than a violation of an ordinance of a municipal corporation that, regardless of the penalty set by ordinance for the violation, is substantially equivalent to any section contained in Title XLV of the Revised Code that is a minor misdemeanor.

*Id.*

{¶ 44}    Defense counsel argued that the death resulted during the commission of a misdemeanor drug transaction.

{¶ 45}    In rejecting defense counsel's request, the trial court concluded as follows:

[W]hile there's an abundance of evidence about the victim being a known marijuana trafficker, I don't believe that there is sufficient evidence that this was a drug deal gone bad or that the defendant was going in to purchase marijuana or anything about it being the proximate — or a drug offense being the proximate cause of the victim's death. So I'm not going to give the instruction on manslaughter.

{¶ 46}    Johnson argues that the state's own theory — that Johnson killed the victim in an apparent robbery — supports a lesser included instruction. In support, Johnson notes that the trial court found insufficient evidence to support the robbery and therefore granted his Crim.R. 29 motion regarding the robbery. He also cites to the state's opening statement wherein the prosecutor noted that the victim was a known drug dealer, selling marijuana out of his home, and that Johnson called the victim before he entered the victim's home.

{¶ 47}   First, the lack of evidence to support a robbery does not necessarily mean there is evidence to support the defense's theory that a drug transaction had occurred or was attempted. Secondly, Johnson's call to a purported drug dealer, without more, is not sufficient evidence of a drug deal gone bad. There was simply no evidence presented that Johnson had gone to the victim's home to purchase marijuana, that a drug transaction had occurred, or that a drug transaction was the proximate cause of the victim's death.

{¶ 48}   Reviewing the evidence in a light most favorable to Johnson, we cannot find the evidence presented at trial would reasonably support both an acquittal on the murder and a conviction upon involuntary manslaughter. We therefore cannot find the trial court abused its discretion in refusing to instruct the jury on the lesser included offense of involuntary manslaughter.

{¶ 49}   Johnson's second assignment of error is overruled.

V.  Manifest Weight of the Evidence

{¶ 50}   In his third and final assignment of error, Johnson contends that the convictions are not supported by the manifest weight of the evidence.

{¶ 51}   A manifest weight challenge questions whether the state has met its burden of persuasion. *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997). This challenge raises a factual issue:

> "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The

discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."

*Id.* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). The use of the word "manifest" in the standard of review "means that we can only reverse the trier of fact if its decision is very plainly or obviously contrary to the evidence." *State v. Hernandez*, 8th Dist. Cuyahoga No. 106577, 2018-Ohio-5031, ¶ 20.

{¶ 52} Here, the video shows Johnson enter Hicks's home, and shortly after Johnson leaves, Hicks is found dead from multiple gunshots. The video also shows Johnson leave Hicks's home with what appears to be a firearm tucked under his arm, as he wipes down the door handle with his jacket sleeve. Johnson is then seen jumping off the porch, running down the street, and discharging a firearm in the street with an unidentified male. The video shows Johnson and this unidentified male shoot in the same direction, get in the same vehicle, and leave the scene. Johnson was also identified by the distinct tattoo on his neck that is visible on the video surveillance; his DNA was discovered under the fingernail of Hicks's right hand; his cell phone records place him in the vicinity of Hicks's home around the time of the homicide; and a call was made from Johnson's cell phone to Hicks's cell phone shortly before the homicide.

{¶ 53} Having reviewed the evidence, we cannot say the factfinder lost its way and created a manifest miscarriage of justice such that Johnson's convictions must be reversed and a new trial ordered.

**{¶ 54}** Johnson's final assignment of error is overruled.

**{¶ 55}** Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
MICHELLE J. SHEEHAN, JUDGE

SEAN C. GALLAGHER, P.J., and
LARRY A. JONES, SR., J., CONCUR