[Cite as *State v. Hamrick*, 2024-Ohio-1364.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 112826 |
| v. | : | |
| PAUL HAMRICK, | : | |
| Defendant-Appellant. | : | |

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 11, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-22-673374-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Dominic Neville, Assistant Prosecuting Attorney, *for appellee*.

Wegman Hessler Valore and Matthew O. Williams, *for appellant*.

MARY J. BOYLE, J.:

{¶ 1} Defendant-appellant, Paul Hamrick ("Hamrick"), appeals his convictions for menacing by stalking and violating a protection order. For the reasons set forth below, we affirm Hamrick's convictions.

## I. Facts and Procedural History

{¶ 2} In September 2022, Hamrick was charged in a four-count indictment. Count 1 charged him with menacing by stalking. Count 2 charged him with telecommunications harassment. Count 3 charged him with violating a protection order. Count 4 charged him with aggravated menacing. These charges arise from allegations which follow the end of a romantic relationship between Hamrick and the victim, H.C., Hamrick continued to send messages to H.C., followed her in his van, and appeared at her house.

{¶ 3} In May 2023, the matter proceeded to a jury trial, at which the following evidence was adduced. The state called four witnesses.

{¶ 4} H.C. testified that Hamrick moved in with her in December 2021, and that the couple continued to date until April 2022. While they lived together, Hamrick assisted with various repairs throughout the home. They began to have issues in their relationship towards the end of March 2022. For example, H.C. recalled an instance of Hamrick punching a hole in a door after H.C.'s teenaged nephew ate his leftovers. According to H.C., she ended their relationship on April 17, 2022, due to Hamrick's anger issues and his lack of respect for her family.

{¶ 5} After their relationship ended, Hamrick continued to call H.C. on her cell phone and at work. H.C. testified that "Hamrick was very angry with me and would call me every day to let me know that I was to pay him for all of the things that he helped me do in my house, or I was going to pay the price." (Tr. 202.) H.C. further testified that Hamrick showed up to her home on multiple occasions after the

breakup. In one of these instances, he followed her home and in another he used his van to block her in the driveway. H.C. testified that she was in "fear for [her] life" because she "[did not] feel safe if [she had] to keep telling somebody twice the size of [her] to back off[.]" (Tr. 225.)

{¶ 6} H.C. testified that she and Hamrick used a variety of electronic messaging applications during their relationship and in their communications thereafter, including text messaging, Instagram, and Duo. As the state sought to admit these messages into evidence, Hamrick raised "a continuing objection to the admissibility of these records," which the trial court overruled. (Tr. 252.) The defense's main point of contention rested with the state's exhibit no. 1, which H.C. identified as texts and Duo messages from Hamrick. (Tr. 206.) H.C. acknowledged that the Duo messages did not have any identifying information on their face but testified that she knew these messages were from Hamrick because "[Hamrick] was the only one I Duo messaged," and because of the way he spoke in their conversations:

> His phone numbers, his Duo, the way he talks, the way he does every message, it's the same thing. There's never a change-up. It is the same — how he presents his self, how he words his words, his text messages, his sentences. Just — when you're around somebody so long, you pick up on that constant — the things that they do. That is how he is.

(Tr. 206, 210.) H.C. testified that one of the Duo messages from Hamrick stated, "My fault? You take it out on me. It was what they did. They caused my reaction, not something I did. So please, [H.C.], you want to tell me why the hell you think I'm the one at fault that you can justify cheating on me and leaving and lying to me." (Tr.

210.) H.C. testified that another Duo message from Hamrick stated he would sue her for defamation if she went to the police and reported him. H.C. stated that this gave her a panic attack. She testified that because of Hamrick's behavior, she applied for a protection order on July 7, 2022, which was served on Hamrick on July 8, 2022.

{¶ 7} H.C. further testified that Hamrick continued to message her and appear at her house after the protection order was granted. On July 20, 2022, Hamrick sent an Instagram message to H.C. stating, "Happy birthday." (Tr. 230.) Then, on August 2, 2022, Hamrick followed H.C. while she was driving home. H.C. noticed Hamrick's van following her on the highway, and he proceeded to drive behind her until she reached her house. The next day, H.C. testified that Hamrick attempted to block H.C. in her driveway as she was leaving her house. Then on August 5, 2022, Lee Lawler ("Lee"), who was H.C.'s boyfriend at the time, testified that he was sitting on H.C.'s front porch when he observed Hamrick's van stop across the street. Lee testified that Hamrick then got out of the vehicle "flip[ped] [him] off [and] call[ed] [him] out." (Tr. 367.) Surveillance video from H.C.'s house corroborates Lee's testimony and was played for the jury. In the video, a van can be seen abruptly stopping in the street before Hamrick gets out, starts to approach H.C.'s house, and puts up his middle finger.

{¶ 8} H.C. testified that she felt tortured and was in fear for her life because of Hamrick's continuous messaging, him following her home, and appearing at her house. (Tr. 246-47.) She testified that these interactions along with the size

difference between the pair and his anger issues added to her fear for her life. (Tr. 225.)

{¶ 9} During trial, the parties learned through H.C.'s testimony that there was surveillance video evidence depicting two incidents of Hamrick appearing at H.C.'s house on August 2, 2022, and August 3, 2022. Hamrick moved for a mistrial, arguing that his lack of access to these videos prior to trial constituted a discovery violation. The state, having just learned of the full surveillance videos itself, did not attempt to introduce the videos into evidence. The trial court excluded the videos from evidence and denied the motion for mistrial.

{¶ 10} Hamrick presented evidence from the police's investigation into the phone numbers provided by H.C. One of the phone numbers H.C. provided the police was associated with another individual, not Hamrick. However, no evidence was admitted contradicting H.C.'s assertion that the Duo messages and other messages were from Hamrick. The parties both rested.

{¶ 11} Following the conclusion of trial, the jury found Hamrick guilty of menacing by stalking and violating a protection order, and not guilty of telecommunications harassment and aggravating menacing. The court sentenced Hamrick to one and a half years of community-control sanction on each count along with four weekends in jail.

{¶ 12} Hamrick now appeals, raising four assignments of error for review, which will be addressed out of order for ease of discussion.

**Assignment of Error I:** The trial court erred to [Hamrick's] prejudice when it denied [Hamrick's] Crim. R. 29 Motion for acquittal where [Hamrick's] conviction for menacing by stalking was not supported by sufficient evidence.

**Assignment of Error II:** [Hamrick's] convictions are against the manifest weight of the evidence.

**Assignment of Error III:** The trial court erred in allowing the state to introduce into evidence alleged text messages.

**Assignment of Error IV:** The trial court erred in denying Appellant's motion for a mistrial where the Government failed to comply with discovery rules.

## II. Law and Analysis

### A. Sufficiency of the Evidence

{¶ 13} In the first assignment of error, Hamrick argues that trial court erred when it denied his Crim.R. 29(A) motion because the evidence was insufficient to establish the elements for menacing by stalking. Specifically, he argues that the state failed to establish the "knowingly" element of menacing by stalking.

{¶ 14} We note that "[a] motion for acquittal under Crim.R. 29(A) is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence." *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37, citing *State v. Carter*, 72 Ohio St.3d 545, 553, 651 N.E.2d 965 (1995); *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. An appellate court's function when reviewing sufficiency is to determine "'whether, after viewing the evidence in a light most favorable to the

prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 15} With a sufficiency inquiry, an appellate court does not review whether the state's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction. *State v. Starks*, 8th Dist. Cuyahoga No. 91682, 2009-Ohio-3375, ¶ 25, citing *Thompkins* at 387. A sufficiency of the evidence argument is not a factual determination, but a question of law. *Thompkins* at 386.

{¶ 16} In *State v. Jones*, 166 Ohio St.3d 85, 2021-Ohio-3311, 182 N.E.3d 1161, the Ohio Supreme Court cautioned:

> But it is worth remembering what is not part of the court's role when conducting a sufficiency review. It falls to the trier of fact to '"resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" [*State v. McFarland*, 162 Ohio St.3d 36, 2020-Ohio-3343, 164 N.E.3d 316, ¶ 24], quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Thus, an appellate court's role is limited. It does not ask whether the evidence should be believed or assess the evidence's "credibility or effect in inducing belief." *State v. Richardson*, 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, ¶ 13, citing *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541. Instead, it asks whether the evidence against a defendant, if believed, supports the conviction. *Thompkins* at 390 (Cook, J., concurring).

*Id*. at ¶ 16.

{¶ 17} Here, Hamrick challenges his menacing by stalking under R.C. 2903.211(A)(1), which provides:

No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or a family or household member of the other person or cause mental distress to the other person or a family or household member of the other person.

"Knowingly" is defined by R.C. 2901.22(B) as:

[T]he person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

Additionally, "mental distress" is defined in R.C. 2903.211(D)(2) as:

(a) Any mental illness or condition that involves some temporary substantial incapacity;

(b) Any mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not any person requested or received psychiatric treatment, psychological treatment, or other mental health services.

{¶ 18} Hamrick argues the state failed to establish that he knowingly placed H.C. in fear of her physical safety or caused her mental distress. Hamrick denies ever threatening H.C. and he specifically disclaimed violence. In support of his argument, Hamrick refers to the following message to H.C.: "I promise you think you hate me now, wait until I'm done. And no this is not a threat this [is] a choice for you to make. I will not physically harm anyone is that clear this is not a threat." Hamrick, however, cannot disclaim that his words and actions were not threats and then continue to act in a way that H.C. testified instilled fear into her daily life.

{¶ 19} A review of the record reveals that Hamrick continued to call and message H.C. on her cell phone and at work. H.C. testified that "Hamrick was very angry with me and would call me every day to let me know that I was to pay him for all of the things that he helped me do in my house, or I was going to pay the price." (Tr. 202.) Hamrick also showed up to her home on multiple occasions after the breakup. In one of these instances, he followed her home and in another he used his van to block her in the driveway. H.C. testified that she was in "fear for [her] life" in these repeated interactions because she "[didn't] feel safe if [she had] to keep telling somebody twice the size of [her] to back off[.]" (Tr. 225.) Further, H.C. testified that she applied for this protection order because she was "scared to open [her] door because [she] didn't know if Mr. Hamrick was going to be on [her] street or in [her] driveway or hanging out and lurking for [her] in certain spots." (Tr. 223.)

{¶ 20} As a result of this fear for her life and its impact on her mental state, H.C. obtained a protection order, which was personally served on Hamrick on July 8, 2022, and prohibited him from engaging in certain acts. Specifically, Hamrick was ordered that he shall not "abuse, harm, attempt to harm, threaten, follow, stalk, harass, force sexual relations upon, or commit sexually oriented offenses against the protected persons named in this Order." Additionally, the following provisions applied to Hamrick:

1. Respondent shall not enter or interfere with the residence, school business, place of employment, day care centers, or child care providers of the protected persons named in this Order, including the buildings, grounds, and parking lots at those locations. Respondent may not violate this Order even with the permission of a protected person.

2. Respondent shall not interfere with protected persons' right to occupy the resident including, but not limited to canceling utilities or insurance or interrupting telecommunication (e.g., telephone, internet, or cable) services, mail delivery, or the delivery of any documents or items.

* * *

4. Respondent shall stay away from Petitioner and all other protected persons named in this Order, and not be present within <u>500 feet</u> (distance) of any protected persons wherever those protected persons may be found, or any place Respondent knows or should know the protected persons are likely to be, even with a protected person's permission. If respondent accidentally comes in contact with protected persons in any public or private place, Respondent must depart *immediately*. This Order includes encounters on public and private roads, highways, and thoroughfares.

5. Respondent shall not remove, damage, hide, or dispose of any property, companion animals, or pets owned by the protected persons named in this Order.

* * *

7. Respondent shall not initiate or have any contact with the protected persons named in this Order or their residences, businesses, places of employment, schools, day care centers, or child care providers. Contact includes, but is not limited to, landline, cordless, cellular or digital telephone; text; instant messaging; fax; e-mail; voicemail; delivery service; social media; blogging; writings; electronic communications; posting a message; or communications by any other means directly or through another person. Respondent may not violate this Order even with the permission of a protected person.

8. Respondent shall not use any form of electronic surveillance on protected person.

9. Respondent shall not cause or encourage any person to do any act prohibited by this Order.

10. Respondent shall not possess, use, or obtain any deadly weapon at any time while the Order remains in effect for the safety and protection of

the protected persons named in this Order. Furthermore, Respondent may be subject to firearms and ammunition restrictions pursuant to 18 U.S.C. 922(g)(1) through (9), 18 U.S.C. 922(n), or R.C. 2923.13. Respondent is expected only for official use pursuant to 18 U.S.C. 925(a)(1), if no other firearms and ammunition prohibitions apply.

11. Respondent shall turn over all deadly weapons owned by Respondent or in Respondent's possession to the law enforcement agency that serves Respondent with this Order no later than 3 days.

{¶ 21} Despite this order, H.C. testified that Hamrick continued to contact her, followed her home, and appeared at her house. H.C. described her mental state after Hamrick continued to disobey the protection order put in place as feeling "tortured" and that "he's scaring [her] enough where [she] feel[s] like [she's] threatened [and] in fear for what [she has] to put up with." (Tr. 246-248.) This evidence, when viewed in a light most favorable to the state, establishes that Hamrick's menacing by stalking conviction was supported by sufficient evidence.

{¶ 22} Therefore, the first assignment of error is overruled.

**B. Admissibility of Duo App Messages**

{¶ 23} In the third assignment of error, Hamrick argues that court erred in allowing the state to introduce into evidence Duo App messages that H.C. created herself. As a result, he contends that his convictions should be overturned and a new trial ordered.

{¶ 24} The admission or exclusion of evidence rests within the sound discretion of the trial court. *State v. Sage*, 31 Ohio St.3d 173, 180, 510 N.E.2d 343 (1987). An abuse of discretion occurs when a court exercises "its judgment, in an

unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 35.

{¶ 25} Evid.R. 901 governs the authentication of demonstrative evidence such as recordings of telephone conversations and text messages. To satisfy the evidence authentication or identification requirement, the proponent must "produce evidence sufficient to support a finding that the item is what the proponent claims it is." Evid.R. 901(A). Thus, text messages must be properly authenticated before they may be admitted. *State v. Irwin*, 2d Dist. Montgomery No. 26224, 2015-Ohio-195, at ¶ 20. The threshold standard for authenticating evidence is low. *State v. Carter*, 8th Dist. Cuyahoga No. 104874, 2018-Ohio-2238, ¶ 39, quoting *State v. Glenn* 8th Dist. Cuyahoga No. 97314, 2012-Ohio-3075, ¶ 25. Evid.R. 901(B) provides examples of numerous ways that the authentication requirement may be satisfied, the most common of which is testimony that a matter is what it is claimed to be. *State v. Renner*, 2d Dist. Montgomery No. 25514, 2013-Ohio-5463, ¶ 30. "[T]he proponent must present foundational evidence that is sufficient to constitute a rational basis for a jury to decide that the primary evidence is what its proponent claims it to be." *State v. Payton*, 4th Dist. Ross No. 01CA2606, 2002-Ohio-508. A proponent may demonstrate genuineness or authenticity through direct or circumstantial evidence. *State v. Williams*, 64 Ohio App.2d 271, 274, 413 N.E.2d 1212 (8th Dist.1979).

{¶ 26} Nevertheless, "'[i]n most cases involving electronic print media, i.e., texts, instant messaging, and e-mails, the photographs taken of the print media or

the printouts of those conversations are authenticated, introduced, and received into evidence through the testimony of the recipient of the messages.'" *Irwin* at ¶ 21, quoting *State v. Roseberry*, 197 Ohio App.3d 256, 2011-Ohio-5921, 967 N.E.2d 233, at ¶ 75 (8th Dist.). In *Roseberry*, we noted the state could have properly admitted text messages from the defendant through the victim's testimony, "because she was the recipient of the text messages, had personal knowledge of the content, and could [identify] the sender of the messages." *Roseberry* at ¶ 75.

{¶ 27} Duo is a messaging app created by Google which allows users to send voice, video, and text messages. Hamrick argues that the authenticated Duo messages were inadmissible as evidence because of the presentation of the messages. Specifically, exhibit No. 1 was admitted into evidence as messages in white text on a black background. He argues that this exhibit cannot be authenticated as his messages because they were not admitted as screenshots of the messages from a messaging platform. However, Hamrick did not put forth evidence that he was not the person who sent these Duo messages.

{¶ 28} The state argues that the messages were properly authenticated in accordance with Evid.R. 901(A) because each message was properly introduced through the common practice of eliciting the witness's H.C.'s testimony. Moreover, H.C. testified that exhibit No. 1 is comprised of screenshots that she personally took of the messages and that exhibit No. 1 fairly and accurately depicts the messages Hamrick sent to her. (Tr. 209.) We find the state's argument more persuasive.

{¶ 29} As stated above, the threshold for admission of such evidence is quite low and is met when the proponent submits "evidence sufficient to support a finding that the matter in question is what its proponent claims." Evid.R. 901(A). The state met this threshold in this case. H.C. authenticated the messages from Hamrick by testifying that the messages proffered as evidence were indeed sent to her from Hamrick. She testified that she knew messages at issue were from Hamrick because she only used the Duo messaging platform with Hamrick and the way he spoke in the messages made it clear that the messages were from him. Additionally, as in *Roseberry*, H.C. knew the messages were from Hamrick because she was the recipient of the messages and had personal knowledge about the content of the messages. *Roseberry* at ¶ 75.

{¶ 30} Therefore, the third assignment of error is overruled.

### C. Manifest Weight of the Evidence

{¶ 31} In the second assignment of error, Hamrick argues that his convictions are against the manifest weight of the evidence.

{¶ 32} When reviewing a manifest weight challenge, an appellate court, "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Virostek*, 8th Dist. Cuyahoga No. 110592, 2022-Ohio-1397, ¶ 54, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A reversal on the basis that a verdict

is against the manifest weight of the evidence is granted "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541 (1997), quoting *Martin* at 175.

{¶ 33} As this court has previously stated:

The criminal manifest weight-of-the-evidence standard addresses the evidence's effect of inducing belief. *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541 (1997). Under the manifest weight-of-the-evidence standard, a reviewing court must ask the following question: whose evidence is more persuasive — the state's or the defendant's? *Wilson* at *id.* Although there may be legally sufficient evidence to support a judgment, it may nevertheless be against the manifest weight of the evidence. *Thompkins* at 387; *State v. Johnson*, 88 Ohio St.3d 95, 2000-Ohio-276, 723 N.E.2d 1054 (2000).

When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the fact finder's resolution of the conflicting testimony. *Wilson* at *id.*, quoting *Thompkins* at *id.*

*State v. Williams*, 8th Dist. Cuyahoga No. 108275, 2020-Ohio-269, ¶ 86-87.

{¶ 34} Hamrick contends that the jury lost its way after being allowed to review state's exhibit No. 1, which consisted of various messages from Hamrick to H.C. that he contends are inadmissible. Hamrick attacks the credibility of this evidence due to the lack of identifying features on the face of the exhibit. After reviewing the entire record, weighing the inferences, and examining the credibility of witnesses, however, we cannot say that the jury clearly lost its way and created a manifest miscarriage of justice by relying on the Duo messages.

{¶ 35} We found exhibit No. 1, the Duo messages, were admissible and Hamrick had the opportunity to cross-examine H.C. on the authenticity of the

messages. Hamrick's actions of messaging H.C. and appearing at her house in violation of H.C.'s protection order provided sufficient evidence to sustain his convictions of menacing by stalking and violation of protection order. Hamrick's convictions are not against the manifest weight of the evidence.

{¶ 36} Accordingly, the second assignment of error is overruled.

**D. Motion for Mistrial**

{¶ 37} In the fourth assignment of error, Hamrick argues that the trial court erred in denying his motion for a mistrial because the state did not comply with discovery rules. Specifically, Hamrick argues that when the police failed to turn over two videos from August 2, 2022, and August 3, 2022, prior to trial, his defense strategy was compromised because he made strategic trial decisions upon the belief that the videos did not exist. He argues that since these videos were not turned over to the defense prior to trial, a mistrial was warranted.

{¶ 38} Trial courts enjoy broad discretion in ruling on motions for mistrial. *State v. Johnson*, 8th Dist. Cuyahoga No. 108621, 2020-Ohio-2940, ¶ 23. Absent an abuse of discretion, a reviewing court will not reverse a trial court's decision regarding a motion for a mistrial. *Id.*, citing *State v. Benson*, 8th Dist. Cuyahoga No. 87655, 2007-Ohio-830, ¶ 136. "A mistrial should not be ordered in a criminal case 'merely because some error or irregularity has occurred, unless the substantial rights of the accused or the prosecution are adversely affected.'" *Johnson* at ¶ 24, quoting *State v. Wilson*, 8th Dist. Cuyahoga No. 92148, 2010-Ohio-550, ¶ 13, citing *State v. Reynolds*, 49 Ohio App.3d 27, 33, 550 N.E.2d 490 (2d Dist.1988). The

essential inquiry on a motion for mistrial is whether the substantial rights of the accused are adversely or materially affected. *Id.*

{¶ 39} Here, defense counsel moved for a mistrial based upon the state's failure to disclose evidence in violation of discovery rules. The purpose of the Crim.R. 16 is "to provide all parties in a criminal case with the information necessary for a full and fair adjudication of the facts, to protect the integrity of the justice system and the rights of defendants, and to protect the well-being of witnesses, victims, and society at large." The rule serves to "'prevent surprise and the secreting of evidence favorable to one party.'" *State v. Wainwright*, 8th Dist. Cuyahoga No. 111725, 2023-Ohio-2292, ¶38, quoting State *v. Johnson*, 8th Dist. Cuyahoga No. 108621, 2020-Ohio-2940, ¶ 26.

{¶ 40} We note, however, that "[a] mistrial is not mandated where a discovery violation occurs." *Johnson* at ¶ 27, citing *State v. Muszynec*, 8th Dist. Cuyahoga No. 87447, 2006-Ohio-5444, ¶ 16. When imposing a sanction for a discovery violation, "'trial courts must conduct an inquiry into the surrounding circumstances and 'impose the least severe sanction that is consistent with the purpose of the rules of discovery.'" *Id.*, quoting *State v. Rucker*, 2018-Ohio-1832, 113 N.E.3d 81, ¶ 20 (8th Dist.), quoting *Papadelis* at paragraph two of the syllabus. The Ohio Supreme Court has held that this inquiry should include three considerations: "(1) whether the [prosecution's] failure to disclose was a willful violation of Crim.R. 16, (2) whether foreknowledge of the undisclosed material would have benefited the accused in the preparation of a defense, and (3) whether

the accused was prejudiced." *State v. Darmond*, 135 Ohio St. 3d 343, 351, citing *State v. Parson*, 6 Ohio St.3d 442, 453 N.E.2d 689 (1983).

{¶ 41} Applying the *Parson* factors, first we must determine whether the state's failure to disclose the videos was a willful violation of Crim.R. 16. Hamrick's counsel argues that their defense strategy may have been different if they had these videos prior to trial. Notably, the state did not have knowledge about the existence of these videos until testimony was elicited at trial. (Tr. 344.) As a result, the state did not attempt to introduce these videos into evidence. (Tr. 347-348.) The state further provided the following: "It's not an exculpatory video, it's inculpatory. If the defense feels that it is, the State of Ohio has no objection with it coming in, because it's not exculpatory, it would help the State of Ohio's case." (Tr. 345.) Upon a review of the record, we cannot say that the failure to disclose these two videos was a willful violation of Crim.R. 16.

{¶ 42} As to the second *Parson* factor, we consider whether foreknowledge of the undisclosed material would have benefited the accused in the preparation of a defense. *Parson*, 6 Ohio St.3d 442, at syllabus. Hamrick's counsel makes no argument that the videos at issue are exculpatory. As the state explained, the videos themselves are inculpatory and in fact would have strengthened the state's case. The video allegedly depicts the above-described incident from August 2, 2022, when a white van follows H.C. and her friend home, the friend gets out of the car, goes up to the white van, and the van subsequently speeds off. (Tr. 344.) H.C. testified that the driver of this vehicle that followed her home on August 2, 2022, was Hamrick.

(Tr. 294.) Therefore, the undisclosed videos would have likely harmed the accused had they been admitted at trial.

{¶ 43} Finally, with respect to the third *Parson* factor, we consider whether Hamrick was prejudiced. *Parson*, 6 Ohio St.3d 442, at syllabus. We reiterate the inculpatory nature of these videos when determining whether there was a discovery violation in this case. In considering whether a defendant was prejudiced, courts often consider the balance of the evidence, notwithstanding the claimed discovery violation. *State v. Lopez*, 6th Dist. Lucas No. L-06-1243, 2007-Ohio-5473, ¶ 24. A reviewing court may overlook an error where the admissible evidence comprises "overwhelming" proof of a defendant's guilt. *State v. Mills*, 8th Dist. Cuyahoga No. 90383, 2008-Ohio-3666, ¶ 20, citing *State v. Williams*, 6 Ohio St.3d 281, 290, 452 N.E.2d 1323 (1983).

{¶ 44} The state presented exhibit No. 4, which was a surveillance video at H.C.'s house depicting Hamrick at H.C.'s house on August 4, 2022. The additional two videos at issue here, according to H.C.'s testimony, depict Hamrick appearing at her house on August 2 and August 3 as well. The state did not attempt to introduce these videos because prior to H.C.'s testimony at trial, the state was unaware that the police were in possession of these videos. The state and Hamrick watched these videos for the first time together, and the state did not attempt to introduce them into evidence as they were aware that such a request would be untimely.

{¶ 45} For the foregoing reasons, we find that the trial court did not abuse its discretion by denying Hamrick's request for a mistrial. The trial court correctly

issued the least restrictive sanction for the violation, which was to prohibit the state from introducing the video.

{¶ 46} Therefore, Hamrick's fourth assignment of error is overruled.

## III. Conclusion

{¶ 47} The court properly denied Hamrick's Crim.R. 29 motion for acquittal because his menacing by stalking conviction was supported by sufficient evidence. Furthermore, his convictions of menacing by stalking and violation of protection order were not against the manifest weight of the evidence. The Duo messages at issue were admissible because they were properly authenticated by H.C. under Evid.R. 901(A). Finally, the court did not abuse its discretion in denying Hamrick's motion for a mistrial because the state did not willfully fail to turn over evidence in discovery.

{¶ 48} Accordingly, the judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

EILEEN A. GALLAGHER, P.J., and
MARY EILEEN KILBANE, J., CONCUR